2014-1676

# United States Court of Appeals for the Federal Circuit

BELDEN INC.,

*Appellant,*

v.

BERK-TEK LLC,

*Appellee.*

*Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board in No. IPR2013-00058*

## BRIEF OF APPELLANT BELDEN INC.

Matthew B. Lowrie
Aaron W. Moore
Matthew A. Ambros
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
P: (617) 342-4000
F: (617) 342-4001

*Attorneys for Appellant Belden Inc.*

October 3, 2014

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Belden Inc. certifies the following:

1.      The full name of every party or amicus represented by me is Belden Inc.

2.      The name of the real party in interest is Belden Inc.

3.      No parent corporation or any publicly held company owns 10 percent of more of the stock of Belden Inc.

4.      The names of all law firms and the partners and associates that have appeared for Belden Inc. before the United States Patent and Trademark Office or are expected appear in this Court are: Foley & Lardner LLP attorneys Matthew B. Lowrie, Aaron W. Moore, and Matthew A. Ambros.

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ....................................................................v

STATEMENT OF RELATED CASES ................................................. viii

I.    STATEMENT OF JURISDICTION ................................................ ix

II.   STATEMENT OF THE ISSUES ....................................................1

III.  STATEMENT OF THE CASE ......................................................2

IV.  STATEMENT OF FACTS ............................................................3

      A.    PROCEDURAL HISTORY ................................................3

      B.    THE CLAIMED INVENTION ...........................................5

      C.    THE *INTER PARTES* REVIEW OF THE '575 PATENT.................11

            1.    The Board's Decision Instituting IPR.......................11

                a.    Tessier '046 ................................................11

                b.    JP '470 ........................................................12

                c.    The Board Granted IPR Based on Berk-Tek's Attorney Argument ........................................14

            2.    Belden's Response ................................................16

                a.    "Channels" ................................................16

                b.    "Twisted Pair Conductors and the Non-Conductive Interior Support Are Twisted Together about a Common Axis to Close the Data Communications Cable" ........................................................20

       c.    Grounds 2-8 ...................................................................22

       d.    Ground 9 ........................................................................24

    3.    Berk-Tek's Reply .....................................................................25

       a.    "Channels" ....................................................................25

       b.    "Twisted Pair Conductors and the Non-Conductive Interior Support Are Twisted Together about a Common Axis to Close the Data Communications Cable" ...........................................................................28

       c.    Ground  9 ........................................................................29

    4.    The Board's Final Written Decision .......................................29

       a.    "Channels" ....................................................................30

       b.    "Twisted Pair Conductors and the Non-Conductive Interior Support Are Twisted Together about a Common Axis to Close the Data Communications Cable" ...........................................................................32

       c.    Grounds 2-8 ...................................................................33

       d.    Ground 9 ........................................................................33

V.    SUMMARY OF THE ARGUMENT ............................................................34

VI.    ARGUMENT.............................................................................................36

    A.    STANDARD OF REVIEW ...............................................................36

    B.    THE BOARD ERRED IN HOLDING THAT CLAIMS 1-9, 12-15, 17, 20, 21, 23 AND 24 OF THE '575 PATENT WERE ANTICIPATED BY TESSIER '046...................................................38

      1.    The Board Erroneously Interpreted "Channels" ......................38

       a.    Belden Was Never Afforded An Opportunity To Address The Reasoning Used By The Board To Interpret This Term.........................................................38

b.    A "Channel" Is a Region That Is at Least Substantially Separated by the Pair Separator, Such That a Substantially Enclosed Passage Is Formed in the Cable ......................................................40

2.    The Board Erroneously Interpreted "Twisted Pair Conductors and the Non-Conductive Interior Support Are Twisted Together About a Common Axis to Close the Data Communications Cable"..................................................46

a.    Claim Construction........................................................47

b.    Tessier '046's Separator Is a Helical Preform That Is Not Twisted Together with Transmission Media.......47

c.    The Board Erroneously Found That the Structures of Tessier '046 and the '575 Patent Were the Same ......48

C.    FOR GROUNDS 2-8, THE BOARD ERRED IN HOLDING THAT CLAIMS 9, 10, 11, 16, 18, 19, 22, 23, 25, 26, 27, 28, 29, 30, 31, 32, 33, AND 34 WERE OBVIOUS OVER TESSIER '046 IN COMBINATION WITH OTHER ART ...............................52

D.    FOR GROUND 9, THE BOARD ERRED IN HOLDING THAT CLAIMS 29, 31 AND 33 ARE ANTICIPATED BY JP '407.................................................................................................54

VII.   CONCLUSION AND STATEMENT OF RELIEF SOUGHT.....................57

ADDENDUM

Final Written Decision................................................................A1

Errata to the Decision ..............................................................A37

U.S. Patent No. 7,977,575 B2....................................................A41

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

iv

# TABLE OF AUTHORITIES

**Cases**

*Page(s)*

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
    637 F.3d 1324 (Fed. Cir. 2011) ..........................................................................44

*AMS Assocs. v. U.S.*,
    737 F.3d 1338 (Fed. Cir. 2013) ..........................................................................40

*Belden Inc. v. Superior Essex Inc. et al.*,
    No. 11-cv-678 (D. Del.) .......................................................................................3

*In re Bond*,
    910 F.2d 831 (Fed. Cir. 1990) ............................................................................39

*Bowles v. Seminole Rock & Sand Co.*,
    325 U.S. 410 (1945) .............................................................................................40

*Comark Comm., Inc. v. Harris Corp.*,
    156 F.3d 1182 (Fed. Cir. 1998) .....................................................................43, 44

*Consol. Edison Co. v. N.L.R.B.*,
    305 U.S. 197 (1938) .............................................................................................40

*Ferguson Beauregard v. Mega Sys., LLC*,
    350 F.3d 1327 (Fed. Cir. 2003) ..........................................................................46

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) ..........................................................................39

*In re Huai-Hung Kao*,
    639 F.3d 1057 (Fed. Cir. 2011) .....................................................................53, 59

*Institute Pasteur v. Focarino*,
    738 F.3d 1337 (Fed. Cir. 2013) ..........................................................................60

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
    256 F.3d 1323 (Fed. Cir. 2001) ..........................................................................47

*K/S HIMPP v. Hear-Wear Techs., LLC*,
   751 F.3d 1362 (Fed. Cir. 2014) ...................................................53, 60

*Monolithic Power Sys., Inc. v. O2 Micro Intern. Ltd.*,
   558 F.3d 1341 (Fed. Cir. 2009) ..............................................................48

*In re NTP, Inc.*,
   654 F.3d 1268 (Fed. Cir. 2011) ..............................................................38

*Rambus Inc. v. Rea*,
   731 F.3d 1248 (Fed. Cir. 2013) ......................................................42, 52

*Richardson v. Suzuki Motor Co.*,
   868 F.2d 1226 (Fed. Cir. 1989) ..............................................................39

*Schiber-Schroth Co. v. Cleveland Trust Co.*,
   311 U.S. 211 (1940) ................................................................................39

*In re Stepan Co.*,
   660 F.3d 1341 (Fed. Cir. 2011) ..............................................................42

*In re Suitco Surface*,
   606 F.3d at 1259 .....................................................................................39

*In re Suitco Surface, Inc.*,
   603 F.3d 1255 (Fed. Cir. 2010) ..............................................................39

*Tempo Lighting, Inc. v. Tivoli, LLC*,
   742 F.3d 973 (Fed. Cir. 2914) ................................................................38

*Verdegaal Bros. v. Union Oil Co. of Cal.*,
   814 F.2d 628 (Fed. Cir. 1987) ................................................................39

*W.L. Gore & Assocs. v. Garlock, Inc.*,
   721 F.2d 1540 (Fed. Cir. 1983) ..............................................................53

*In re Wilson*,
   424 F.2d 1382 (CCPA 1970) ..................................................................39

*In re Zurko*,
   258 F.3d 1379, 1385-6 (Fed. Cir. 2001) ................................................53

**Statutes and Regulations**

35 U.S.C. § 102 ..................................................................................1, 2

35 U.S.C. § 103 ..............................................................................1, 2, 39

35 U.S.C. § 314 ....................................................................................36

35 U.S.C. § 316 ................................................................................38, 53

37 C.F.R. § 42.2 ...................................................................................36

37 C.F.R. § 42.51 ..................................................................................27

37 C.F.R. § 42.104 ................................................................................36

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5(a), Appellant Belden Inc. ("Belden") certifies that there is no other appeal in this proceeding from the United States Patent and Trademark Office that was previously before this Court or any other appellate court.

On September 2, 2014, this Court ordered that the present appeal be considered a companion case with Appeal No. 14-1677 and assigned to the same merits panel for oral argument.  (Doc. 17.)

Belden and Appellee Berk-Tek LLC ("Berk-Tek") are presently engaged in cross-appeals concerning a separate patent (Appeal Nos. 14-1575 and 14-1577) before this Court.

Pursuant to Fed. Cir. R. 47.5(b), the Court's decision in this appeal may affect *Nexans Inc. v. Belden Inc., et al.*, No. 12-cv-1491 (D. Del.), a district court action where the involved U.S. Patent No. 7,977,575 is asserted.  The district court action has been stayed pending the outcome of the present appeal.  (*See* Jun. 19, 2014 Order Re. D.I. 85.)

# I.  STATEMENT OF JURISDICTION

The United States Patent and Trademark Office ("PTO") Patent Trial and Appeal Board (the "Board") had jurisdiction over Berk-Tek's *inter partes* review Petition pursuant to 35 U.S.C. § 6.

On April 28, 2014, the Board issued its Final Written Decision in the *inter partes* review.  (A52; A1-A36.)  On June 27, 2014, in compliance with 37 C.F. R. § 90.3(a)(1), Belden timely filed its Notice of Appeal.  (Doc. 1.)

On September 2, 2014, this Court ordered that the present appeal be considered a companion to Appeal No. 14-1676.  (Doc. 17.)

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 329.

## II.  STATEMENT OF THE ISSUES

1.    Whether the Board erred in finding that claims 1-9, 12-15, 17, 20, 21, 23, and 24 of U.S. Patent No. 7,977,575 (the "'575 Patent) are unpatentable under 35 U.S.C. § 102 as anticipated by Canadian Application No. 2,058,046 to Tessier ("Tessier '046"), where the reference does not contain the claimed "channels" and does not teach a cable in which the core and the conductors are "twisted together," as required by the claims, and where the Board completely disregarded unrebutted evidence of the meaning of the claims and the teachings of the reference from a person of ordinary skill in the art;

2.    Whether the Board erred in finding that claims 9-11, 18, 19, 23, 25, and 28 of the '575 Patent are unpatentable under 35 U.S.C. § 103 as obvious over Tessier '046 and U.S. Patent No. 4,935,467 to Cheng ("Cheng '467");

3.    Whether the Board erred in finding that claim 16 of the '575 Patent is unpatentable under 35 U.S.C. § 103 as obvious over Tessier '046 and U.S. Patent No. 3,888,710 to Burk ("Burk '710");

4.    Whether the Board erred in finding that claims 22 and 27 of the '575 Patent are unpatentable under 35 U.S.C. § 103 as obvious over Tessier '046 and U.S. Patent No. 3,209,064 to Cutler ("Cutler '064");

5.     Whether the Board erred in finding that claim 26 of the '575 Patent is unpatentable under 35 U.S.C. § 103 as obvious over Tessier '046 and Japanese Patent Sh061(1986)-13507 to Kuwaki ("JP '507");

6.     Whether the Board erred in finding that claims 29, 31, and 33 of the '575 Patent are unpatentable under 35 U.S.C. § 103 as obvious over Tessier '046 and U.S. Patent No. 5,399,813 to McNeill ("McNeill '813");

7.     Whether the Board erred in finding that claim 30 of the '575 Patent is unpatentable under 35 U.S.C. § 103 as obvious over Tessier '046, McNeill '813, and Cheng '467;

8.     Whether the Board erred in finding that claims 32 and 34 of the '575 Patent are unpatentable under 35 U.S.C. § 103 as obvious over Tessier '046, McNeill '813, and Cutler '064; and

9.     Whether the Board erred in finding that claims 29, 31 and 33 of the '575 Patent are unpatentable under 35 U.S.C. § 102 as anticipated by Japanese Patent Sh043(1968)-15470 to Yanagida ("JP '407").

## III.   STATEMENT OF THE CASE

This appeal arises from an *inter partes* review ("IPR") instituted by the Board under the Leahy-Smith America Invents Act ("AIA").  Belden, the petitioner in this appeal, is the owner of the '575 Patent, for which the Board instituted the IPR.

As shown herein, the Board made errors in its legal conclusions and performed fact finding that lacks the support of substantial evidence.  In particular, the Board's Final Decision of unpatentability is premised entirely on unsupported attorney argument that is demonstrably incorrect, and the Board improperly ignored an unrebutted declaration from a person of skill in the art explaining the meaning of the language used in the '575 Patent's claims and the teachings of the prior art.

## IV.    STATEMENT OF FACTS

### A.    PROCEDURAL HISTORY

On November 19, 2012, Berk-Tek filed its Petition for IPR of Belden's '575 Patent.  (A52.)[1]  On November 26, 2012, Berk-Tek filed an Amended Petition that addressed errors in the exhibits submitted with the original Petition.  (A52; A120.)

On May 2, 2013, the Board issued its Decision instituting IPR on nine Grounds:  (1) anticipation of claims 1-9, 12-15, 17, 20, 21, 23, and 24 by Tessier '046; (2) obviousness of claims 9, 10, 11, 18, 19, 23, 25, and 28 in view of Tessier

---

[1] Prior to the filing of Berk-Tek's declaratory judgment complaint and Berk-Tek's IPR Petition, the '575 Patent was asserted in litigation that was terminated by consent judgment prior to the commencement of discovery.  *See Belden Inc. v. Superior Essex Inc. et al.,* No. 11-cv-678 (D. Del.) (D.I. 19).

The '575 Patent was also the subject of an *inter partes* reexamination.  (*In re Gareis et al.*, Control No. 95/001,751.)  That reexamination was terminated when the District Court proceedings were settled.  (*See, e.g., In re Gareis et al.*, Control No. 95/001,751 (February 24, 2012 Decision Granting Petition to Terminate).).  At the time of the termination, in a ***non-final*** action, the Examiner had found a substantial new question of patentability affecting claims 1-34 of the '575 Patent.

'046 and Cheng '467; (3) obviousness of claim 16 in view of Tessier '046 and Burk '710; (4) obviousness of claims 22 and 27 in view of Tessier '046 and Cutler '064; (5) obviousness of claim 26 in view of Tessier '046 and JP '507; (6) obviousness of claims 29, 31, and 33 in view of Tessier '046 and McNeill '813; (7) obviousness of claim 30 in view of Tessier '046, McNeill '813, and Cheng '467; (8) obviousness of claims 32 and 34 in view of Tessier '046, McNeill '813, and Cutler '064; and (9) anticipation of claims 29, 31 and 33 by JP '470.  (A448-A449.)  The Board denied institution of the IPR with respect to other grounds identified in Berk-Tek's Petition.  (A449.)

On July 17, 2013, Belden filed its Response, identifying the deficiencies in the Grounds on which the Board instituted IPR, with the support of a declaration from the '575 Patent's inventor, Galen Gareis.  (A52; A485-A510.)  Berk-Tek filed its Reply on October 2, 2013.  (A52.)

The Board heard oral argument on January 8, 2014 (A52) and issued its Final Written Decision on April 28, 2013, finding the claims of the '575 Patent unpatentable for the Grounds contained in its Order Instituting IPR.  (A1-A36 at A35-A36.)

On June 27, 2014, Belden timely filed its Notice of Appeal, seeking review of the Board's invalidity rulings.  (Doc. 1.)

## B.    THE CLAIMED INVENTION

The '575 Patent is directed to a high-speed telecommunications cable that has an interior support or "star separator."  (A41-A50, '575 Patent, at 1:26-28; A485-A510 at A491-A492; *see also* A1-A36 at A3.)

### 1.    "Channels"

In the '575 Patent's cable, a separator extends along the length of the cable and has a central region and a plurality of prongs or splines that extend outward from the central region.  When an overall jacket is applied to the cable, the separator's prongs or splines, along with the cable jacket, define "channels" through which twisted cable pairs run.  (A485-A510 at A498-A502.)  An embodiment is illustrated in Figure 1:



(A41-A50, the '575 Patent, at A43)

As shown by the language highlighted in claims 1, 17, and 24 below, each of these claims require that the separator, in cooperation with the cable's outer jacket, creates "channels" into which twisted pair conductors are disposed.  (A485-A510 at A494-A502.)

> 1.    An unshielded twisted pair data communications cable comprising:
>
> a plurality of twisted pair conductors configured to carry data communications signals;
>
> a non-conductive interior support consisting of at least one nonconductive material and ***having a surface that defines a plurality of channels in the data communications cable within which the plurality of twisted pair conductors are individually disposed***; and
>
> an outer jacket longitudinally enclosing the plurality of twisted pair conductors and the non-conductive interior support to form the data communications cable, the outer jacket being formed of a non-conductive material;
>
> wherein the outer jacket in combination with the non-conductive interior support maintains the plurality of twisted pair conductors ***within the channels defined by the surface of the non-conductive interior support;*** and
>
> wherein the unshielded data cable does not include a shield between the outer jacket and the twisted pair conductors and the non-conductive interior support.

(A41-A50, '575 Patent, at 6:51-7:3 (emphasis added).)

> 17.    A twisted pair data communications cable comprising:
>
> four twisted pair conductors configured to carry data communications signals;

a non-conductive interior support ***having a surface that defines four channels, one twisted pair conductor of the four twisted pairs of conductors respectively disposed in each of four channels***;

and an outer jacket longitudinally enclosing the four twisted pair conductors and the non-conductive interior support to form the data communications cable, the outer jacket consisting of one or more nonconductive materials;

wherein the outer jacket in combination with the non-conductive interior support ***maintains the four twisted pair conductors within the four channels defined by the surface of the non-conductive interior support***;

wherein the non-conductive interior support comprises a longitudinally extending central portion and four projections extending radially outward from the central portion;

wherein the four channels are defined by adjacent pairs of the four projections; and wherein each projection has a non-uniform width.

(A41-A50, '575 Patent, at 8:3-25 (emphasis added).)

24.    A twisted pair data communications cable consisting of:

four twisted pair conductors configured to carry data communications signals;

a non-conductive interior support comprising a longitudinally extending central portion and four projections extending radially outward from the central portion; and

an outer jacket longitudinally enclosing the four twisted pair conductors and the non-conductive interior support, the outer jacket being formed of a non-conductive material;

wherein the four projections form four adjacent pairs of projections that ***define four channels in which the four twisted pair conductors are individually disposed***;

wherein each projection of the four projections has a base that is integral with the central portion of the non-conductive interior support, a tip, a first lateral side, and a second lateral side, the first lateral side and the second lateral side extending from the base to the tip of the projection, the first and second lateral sides converging toward one another from the base to the tip of the projection;

wherein the outer jacket in combination with the non-conductive interior support ***maintains the four twisted pair conductors within the four channels defined by the four adjacent pairs of projections***; and

wherein the four twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the data communications cable.

(A41-A50, '575 Patent, at 8:46-9:7 (emphasis added).)

## 2.    "Twisted Together"

As acknowledged in the Board's Final Written Decision, the separator "grooves [] accommodate twisted pair conductors allowing for easy spacing of the twisted pairs that improves near-end cross-talk (NEXT) and lessens the need for complex and hard to control lay procedures and individual shielding" of the twisted conductor pairs.  (A1-A36 at A3; A41-A50, '575 Patent, at 1:43,2:1-9.)

The "complex and hard to lay procedures" that the Board referenced correspond to the process by which the pair separator/interior support is helically twisted along with the twisted pairs, about a common axis, by the so-called

'cabling' process that is used to close the '575 Patent's cable.  (A41-A50, '575

Patent, at 5:27-28, 6:23-32.)  The '575 Patent explains that, once "cabled" with the

twisted conductor pairs, the separator will have a "helixed or S-Z configuration."

(A41-A50, '575 Patent, at 5:27-28, 6:30-32; A485-A510 at A491, A494-A497,

A502-A504.)

Independent claims 24 and 29 require that the twisted conductor pair

transmission media be helically twisted together with the star separator.

24.    A twisted pair data communications cable consisting of:

four twisted pair conductors configured to carry data
communications signals;

a non-conductive interior support comprising a longitudinally
extending central portion and four projections extending radially
outward from the central portion; and

an outer jacket longitudinally enclosing the four twisted pair
conductors and the non-conductive interior support, the outer jacket
being formed of a non-conductive material;

wherein the four projections form four adjacent pairs of
projections that define four channels in which the four twisted pair
conductors are individually disposed;

wherein each projection of the four projections has a base that
is integral with the central portion of the non-conductive interior
support, a tip, a first lateral side, and a second lateral side, the first
lateral side and the second lateral side extending from the base to the
tip of the projection, the first and second lateral sides converging
toward one another from the base to the tip of the projection;

wherein the outer jacket in combination with the non-conductive interior support maintains the four twisted pair conductors within the four channels defined by the four adjacent pairs of projections; and

*wherein the four twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the data communications cable*.

(A41-A50, '575 Patent, at 8:46-9:7 (emphasis added).)

29.    An unshielded twisted pair data communications cable comprising:

a plurality of twisted pair conductors configured to carry data communications signals;

a non-conductive, unshielded interior support constructed and arranged within the cable to provide at least two channels within which the plurality of twisted pair conductors are disposed, at least one channel containing at least two twisted pair conductors;

and an outer jacket longitudinally enclosing the plurality of twisted pair conductors and the non-conductive interior support;

wherein the non-conductive, unshielded interior support consists of at least one dielectric material; and

*wherein the plurality of twisted pair conductors and the non-conductive interior support are helically twisted together about a common central axis to close the data communications cable*.

(A41-A50, '575 Patent at 9:23-10:11) (emphasis added).

Similar limitations are found in dependent claims 12 and 13 (which depend from claim 1) and 20 and 21 (which depend from claim 17), all of which recite cables in which "the plurality of twisted pair conductors and the non-conductive

interior support are twisted together about a common axis to close the cable," including using an alternating S-Z twisting scheme.  (A41-A50, '575 Patent, at 7:50-57, 8:32-39.)

As discussed below, the Board instituted the IPR and rendered its adverse Final Written Decision even though the primary reference, Tessier '046, included neither the claimed "channels," nor transmission media "twisted together" with the interior support to close the cable.

## C. THE *INTER PARTES* REVIEW OF THE '575 PATENT

### 1. The Board's Decision Instituting IPR

#### a. *Tessier '046*

Eight of the nine Grounds in the IPR relied on Tessier '046.  (A448-A449.) The reference describes a cable with a "core member 22" disposed between twisted conductor pair transmission media.  (A181-A194, Tessier '046, at 4:14-17, 4:27-29.)

Unlike the '575 Patent, the projections of Tessier '046's core member, depicted below in cross-sectional Figures 2 and 3, do not extend near the cable jacket.  (A181-A194, Tessier '046, at A192-A193):



FIG.2        FIG. 3

In addition, unlike the '575 Patent, Tessier '046 teaches that its projections are *preformed* helixes that extend longitudinally along the length of the cable. (A181-A194, Tessier '046, at 4:14-17, 4:27-29.)

For example, with respect to its second embodiment, which has the core member 20, Tessier '046 explains that "[t]he projections 24 and thus the recesses 26 **extend in helical fashion along the core member 20** to allow the pairs 14 to lie within the recesses in stranded fashion." (A181-A194, Tessier '046, at 4:14-17.) With respect to the third embodiment, which has the body 32, Tessier '046 explains that "the central core member 20 of the second embodiment is replaced by a spacer means in the form of **a body 32 formed by four helically extending spokes 34**." (A181-A194, Tessier '046, at 4:27-29.)

### b. *JP '470*

Ground 9 of the IPR relied on JP '470, which is titled "Alternately stranded cable." (A449; A195-A199, JP '470, at A196.) JP '470's cable includes a

reciprocating plate body 2 and a plurality of insulated element wires 1 that extend

along the plate body 2, as shown in Figure 2:



(A195-A199, JP '470, at A1967; A485-A510 at A507.)

Notably, the plate body 2 is formed into a solid reciprocating shape by

softening the plate body material using an increased temperature, and then, after

the plate body 2 is formed, the wires 1 are run along the plate body.  (A195-A199,

JP '470, at A196; A485-A510 at A507.)  JP '470 specifically explains this as

follows:

> Core material 2 is most effectively shown in Figure 2; as shown
> therein, ***the material is formed into a reciprocatingly twisted state by
> slowly changing the facing of both surfaces as the material moves in
> the longitudinal direction***. This can be achieved by twisting the
> facing direction of the plate body to the opposing direction at fixed
> intervals while maintaining the rigid plastic or other material of the
> horizontal plate at a prescribed temperature. Proximal to both surfaces
> of the core material obtained in this manner, in order to longitudinally
> run the insulated element wire while twisting it in the direction of
> those surfaces, ***the core material is caused to be inserted into a guide
> hole provided on the fringe [of the revolving butt strap];
> subsequently, while the tips of these are indexed through dies,
> reciprocating rotation should be conducted by combining the
> revolving butt strap with the twisting of the core material***.

(A195-A199, JP '470, at A196; A485-A510 at A508) (emphasis added).

JP '470 further teaches that its cable is structurally distinguished from that of a "stranded" cable, whose components are twisted together pursuant to "cabling" procedures, *e.g.*, as in the '575 Patent, because twisted cables are prone to untwisting:

> As communications cable, there is a tendency to use a plurality of either insulated element wires or else stranded pairs or stranded quad or such, or otherwise to use so-called alternatively stranded cable with which units of the wires are stranded in a manner so that the stranding direction is reversed at points in time within a fixed cycle. ***However, with such types of cable, in particular when tensile force is applied in the longitudinal direction prior to conducting cable sheathing, a problem occurs in that the stranded cable core becomes unraveled; in order to prevent this, various contrivances have been attempted, but these have all turned out to be problematic from the standpoint of practical application***. This invention has been developed in consideration of these points.

(A195-A199, JP '470, at A196) (emphasis added).

### c. *The Board Granted IPR Based on Berk-Tek's Attorney Argument*

In its Order Instituting IPR, the Board acknowledged that "[t]here is a 'heavy presumption' that a claim term is given its ordinary and customary meaning," as would be understood by a person of ordinary skill in the art. (A430-A431.) Berk-Tek, however, did not rely on any testimony of a person of ordinary skill in the art in support of its Petition. (A430-A431.)

14

With respect to "channels," the Board relied only on a portion of Tessier '046 that states "[a] central core member may be provided with the conductor pairs extending around the core member which may have spokes to separate the conductor pairs." (A431-A433.)

With respect to twisting in Tessier '046, the Board did not directly address the requirement that "the plurality of twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the cable," including using an alternating S-Z twisting scheme. (A41-A50, '575 Patent, at 7:50-57, 8:32-39.) Rather, the Board stated only that Tessier '046 included "a spacer means in the form of a body 32 formed by four helically extending spokes 34." (A432.)

With respect to twisting in JP '470, the Board observed that the "core plate body 2" was formed of a "ridged plastic" (A430), but offered no further discussion of the requirement that "that plurality of twisted pair conductors and the non-conductive interior support are helically twisted together about a common central axis to close the data communications cable." (A41-A50, '575 Patent, at 9:22-10:11.)

### 2. Belden's Response

#### a. "Channels"

With the support of Mr. Gareis' Declaration,[2] Belden's Response explained that, in the context of the claims of the '575 Patent, term "channels" was a region that is at least substantially separated by the pair separator/interior support, such that a substantially enclosed passage is formed in the cable. (A485-A510 at A498-A502; A517-A522 at A520, ¶ 11.)

Each of independent claims 1, 17, and 24 recite "a non-conductive interior support" (or "separator") with a surface that defines "channels" in the finished cable, which includes a cable "jacket," and twisted pairs that are individually disposed in each channel. (A41-A50, '575 Patent, at 6:51-7:3, 8:3-25, 8:46-9:7.) This enclosed channel is created by constructing the interior support to have arms that are dimensioned to extend near the outer cable jacket or covering, as shown in Figure 1 of the '575 Patent, which is reproduced above. (A41-A50, '575 Patent at A43; *see also id.* at 3:28-29 (explaining that, in the finished cable, "[a]djacent splines are separated from each other to provide a cable chamber").) There is no

---

[2] Mr. Gareis's Declaration is part of the prosecution history of the '575 Patent, as it was submitted in the *inter partes* reexamination of the parent U.S. Patent No. 7,633,061 (the "'061 Patent"), as well as in the earlier *inter partes* reexamination of the '575 Patent (No. 95/001,751). The '061 Patent is the '575 Patent's parent and also claims "channels." (*See, e.g.*, A124-A125.)

16

"channel" in the '575 Patent that is not substantially enclosed.  (A485-A510 at A498-A502.)

Moreover, the claimed substantially enclosed channel configuration is not an arbitrary feature of the '575 Patent's cable. With regard to this structural requirement, the '575 Patent notes that "[t]he crush resistance of applicants' star separator helps preserve the spacing of the twisted pairs, and control twisted pair geometry relative to other cable components."  (A41-A50, '575 Patent at 6:28-30.)

Belden's Response explained that the '575 Patent's use of the term "channel" comports with dictionary definitions of the word.  (*See* A485-A510 at A498-A499; A511-A513 (Webster's New Collegiate Dictionary 184 (1981) (defining a channel as "a usually tubular enclosed passage: CONDUIT")); A514-A516 (Webster's Third New International Dictionary 374 (2002) (defining a channel as "an especially tubular enclosed passage: CONDUIT, PIPE, DUCT <the poison ~ in a snake's fangs>").).

The Response further noted that the '575 Patent's "channels" ***must*** be substantially enclosed passages, because the specification explains that "[e]ach pair of adjacent [pair separator] splines defines a groove (22)."  (A41-A50, '575 Patent, at 4:51; A485-A510 at A499-A500.)  The "grooves" formed by adjacent separator arms are illustrated in Figure 4 (A41-A50, '575 Patent, at A44):



FIG. 4

"Groove (22)"

Thus, when considering the pair separator alone (without a jacket or cable covering), the area between separator prongs is a "groove," and the term "channel" is reserved in the patent for describing the substantially enclosed space that is formed when the jacket is closed around the arms to enclose the twisted pairs. (A485-A510 at A499-A500.)

For these reasons, Belden's Response showed that one of skill in the art would have understood the ordinary and accustomed meaning of "channel," as used in the '575 Patent, to be a region that is at least substantially separated by the pair separator/interior support, such that a substantially enclosed passage is formed in the cable. (A485-A510 at A498-A502; *see also* A517-A522 at A520, ¶ 11.)

With respect to Ground 1, Belden's Response first explained that Tessier '046 could not anticipate because it failed to teach an interior support with adjacent arms that define "channels," as required by the claims. (A485-A510 at A494-

A502.)  Mr. Gareis described how "[t]he cables of Tessier do not have [the claimed] channels" because "the cables of Tessier have one large cylindrical channel, the core member 20 being located in the center of the channel."  (A517-A522 at A520, ¶ 11.)

The Response next explained that, comparing Figure 1 of the '575 Patent to Figures 2 and 3 of Tessier '046, "it becomes clear that the projections 24 and spokes 34 [of Tessier '046] do **not** define "channels" in the cables, in contrast to the '575 Patent" (A485-A510 at A500-A501):

| '575 Patent, Figure 1<br><br>Clearly defined *channels* created by the pair separator/interior support. |  |
|---|---|
| **Tessier '046, Figure 2**<br><br>The central core member 22 of does not form channels. |  |



| **Tessier '046, Figure 3**<br><br>The body 32 does not form channels. | |
| --- | --- |

As Mr. Gareis further explained, "[t]he projections 24 and spokes 34 of Tessier '046 do not "define" the cylindrical channel, or any other substantially enclosed channel."  (A517-A522 at A520, ¶ 11; A485-A510 at A500-A501.)

Finally, Mr. Gareis' observed that "Tessier '046 also does not suggest that its cable might be modified so that the projections 24 or spokes 34 do define channels in the cable" and that "[i]n fact, Tessier '046 does not recognize that extending the projections 24 or spokes 34 would have any effect on the performance of the cable."  (A517-A522 at A520, ¶ 11.)

> **b.    *"Twisted Pair Conductors and the Non-Conductive Interior Support Are Twisted Together about a Common Axis to Close the Data Communications Cable"***

As acknowledged in the Board's Final Written Decision (A1-A36 at A3), the pair separator of the '575 Patent is twisted with the transmission media so as to improve the flexibility of the finished cable and ensure that the twisted conductor pairs are securely intertwined with the pair separator.  (*See also* A41-A50, '575

Patent, at 1:43, 2:1-9, 6:28-32 ("Further, adding a helical or S-Z twist improves flexibility while preserving geometry.").)

Belden's Response explained that Tessier '046's core member 22 and body 32 were *formed as helixes* (A181-A194, Tessier '046, at 4:14-17, 4:27-29), meaning that its core member 22 and body 32 were not "twisted together about a common axis to close the data communications cable," as in the '575 Patent. (A41-A50, '575 Patent, at 9:5-7,7:50-53, 8:32-35, 7:54-57, 8:36-39; A485-A510 at A502-A504.)

Regarding Tessier '046's second embodiment (with the core member 20), the reference explains that "[t]he projections 24 and thus the recesses 26 *extend in helical fashion along the core member 20* to allow the pairs 14 to lie within the recesses in stranded fashion." (A181-A194, Tessier '046, at 4:14-17; A485-A510 at A502-A503.) Similarly, in Tessier '046's third embodiment (with the "body 32"), the reference explains that "the central core member 20 of the second embodiment is replaced by a spacer means in the form of *a body 32 formed by four helically extending spokes 34*." (A181-A194, Tessier '046, at 4:27-29; A485-A510 at A503.)

Therefore, Tessier '046's core member/body is manufactured by helically extruding the core member/body such that it has a helical geometry even before it is wrapped in the jacket 12. (*See, e.g.,* A181-A194, Tessier '046, at A192-A193;

21

A485-A510 at A503-A504.)  This means that the core member/body of Tessier

'046 is ***not*** twisted together with the insulated pairs 14 along the length of the

cable.  (A181-A194, Tessier '046, at A192-A193; *id.* at 4:14-17, 4:27-29; A485-

A510 at A502-A504.)

Thus, Tessier '046 is not the same as what is claimed in independent claim

24 or dependent claims 12, 13, 20, or 21 of the '575 Patent.  (A485-A510 at A502-

A504.)  In contrast to the core member of Tessier '046, the separator/interior

support of the '575 Patent is formed such that the arms extend linearly in an axial

direction along the length of the pair separator/interior support, and is then

helically twisted along with the twisted pairs, about a common axis, as a result of

the so-called "cabling" process that is used to close the '575 Patent's cable.

(A485-A510 at A502-A504; A1-A36 at A3; A41-A50, '575 Patent, at 1:43,2:1-9,

6:28-32.)

### c.    *Grounds 2-8*

For Ground 2, Belden's Response explained that dependent claims 9, 10,

and 11 were not unpatentable for the reasons identified with respect to their

independent claim 1, that claims 18, 19, and 23 were not unpatentable for the

reasons identified with respect to their independent claim 17, and that claims 25

and 28 were not unpatentable for the reasons identified with respect to their

independent claim 24.  (A485-A510 at A504.)

For Ground 3, Belden's Response explained that dependent claim 16 was not unpatentable for the reasons identified with respect to its independent claim 1. (A485-A510 at A505.)

For Ground 4, Belden's Response explained that dependent claim 22 was not unpatentable for the reasons identified with respect to its independent claim 17, and dependent claim 27 was not unpatentable for the reasons identified with respect to its independent claim 24.  (A485-A510 at A505.)

For Ground 5, Belden's Response explained that dependent 26 was not unpatentable for the reasons identified with respect to its independent claim 24. (A485-A510 at A505.)

For Ground 6, Belden's Response explained that dependent claims 29, 31, and 33 were not unpatentable for the reasons identified with respect to their independent claim 29, as well as for the reasons identified with respect to claim 24, requiring that "the plurality of twisted pair conductors and the non-conductive interior support are helically twisted about a common central axis to close the data communications cable."  (A485-A510 at A506.)

For Ground 7, Belden's Response explained that dependent 30 was not unpatentable for the reasons identified with respect to its independent claim 29. (A485-A510 at A506.)

And for Ground 8, Belden's Response explained that dependent claims 32 and 34 were not unpatentable for the reasons identified with respect to their independent claim 29.  (A485-A510 at A506.)

### d.    Ground 9

As explained above, JP '470 teaches an "interior support [that] is formed in a manner where the structure is twisted in a reciprocating fashion," such that it has a fixed helical geometry before being placed in a cable with the transmission media.  (A134-A135; A485-A510 at A507-A509.)

With respect to its "core," JP '470 specifically explains that "the material is formed into a reciprocatingly twisted state by slowly changing the facing of both surfaces as the material moves in the longitudinal direction."  (A195-A199, JP '470, at A196; A485-A510 at A507-A509.)  Thereafter, "the core material is caused to be inserted into a guide hole provided on the fringe [of the revolving butt strap]," and "[s]ubsequently, while the tips of these are indexed through dies, reciprocating rotation should be conducted by combining the revolving butt strap with the twisting of the core material."  (A195-A199, JP '470, at A196; A485-A510 at A507-A509.)  Berk-Tek's Petition admitted that JP '470's "interior support is formed in a manner where the structure is twisted in a reciprocating fashion" and that "insulated wires, either single wires or pairs, *are positioned on one side of the separator*."  (A135-A136; A485-A510 at A508.)

24

As explained in Belden's Response, however, in contrast to the disclosure of JP '470, claim 29 of the '575 Patent specifically requires that "the plurality of twisted pair conductors and the non-conductive interior support *are helically twisted together about a common central axis to close the data communications cable.*"  (A41-A50, '575 Patent, at 9:5-7, 7:50-53, 8:32-35, 7:54-57, 8:36-39; A485-A510 at A502-A504.)

### 3.     Berk-Tek's Reply

Berk-Tek did not seek to cross-examine Mr. Gareis and did not provide a rebuttal declaration from an expert or from person of ordinary skill in the art with its Reply.  *See* 37 C.F.R. § 42.51.  As a result, the Reply did not include *any* evidence from a person of ordinary skill in the art rebutting Mr. Gareis' declaration regarding the meaning of the '575 Patent's claims or a person of skill in the art's understanding of Tessier '046, which formed the bases for eight of nine purported grounds for unpatentability.

### a.     *"Channels"*

Regarding "channels," Berk-Tek, relying on attorney argument only, asserted that Mr. Gareis' explanation was of the term was wrong because "[t]he only example in the specification showing the closed cable, Figure 1, illustrates 'entirely enclosed' channels," such that that "'[s]ubstantially enclosed' has no meaning or support within the context of the present proceedings."  (A532.)

Berk-Tek then criticized Belden's explanation of the meaning of the term "channels" in view of the '575 Patent's Figure 1, asserting that "Figure 1 is not the only embodiment in the '575 Patent Specification." (A534.) Berk-Tek did not, however, identify any embodiment of the '575 Patent with channels that are not substantially enclosed.

Berk-Tek's Reply also pointed to Figure 3 of the '575 Patent—which shows the '575 Patent's interior support/separator *in isolation*—to argue that it and the related description show both "a maximum tip to tip distance (where the tips would contact the inner wall of the jacket)" and "shorter tip distances which would necessarily not contact the jacket and would thus not form enclosed passages." (A535.) The cited portion of the '575 Patent, however, merely identifies the various possible dimensions of the star separator. Berk-Tek's assertion that this "necessarily impl[ies]" that its arms do not reach the cable jacket was nothing more than conjecture. (A41-A50, '575 Patent, at 4:51-5:11.)

Berk-Tek also attempted to discount the dictionary definitions of the term "channel" identified in Belden's Response, asserting that "the general meanings gleaned from a dictionary must always be compared against the use of the terms in context." (A533.) The "context," however, is the '575 Patent, in which, again, every embodiment has substantially enclosed channels. (A41-A50, '575 Patent A43, A517-A522 at A520, ¶ 11.)

26

Berk-Tek next argued that "channel" cannot mean substantially enclosed in '575 Patent because "the presence of claim 2 renders such claim interpretation of the term "channel" impossible," because "[Belden's] interpretation of 'channel' in claim 1 to mean 'substantially enclosed' would be narrower than claim 2." (A538.)  That is incorrect.  Claim 2 depends from claim 1 and further states that the "projections extend[] radially outward from the longitudinally extending central portion to at least an outer boundary defined by an outer dimension of the twisted pair conductors."  (A41-A50, '575 Patent at 7:4-10.)  The additional requirement that the interior support projections extend "to at least an outer boundary defined by *an outer dimension of the twisted pair conductors*" has nothing to do with whether *the channels* are substantially enclosed.  Furthermore, claim 2 recites additional matter, *e.g.*, that the interior support includes a "longitudinally extending central portion," that narrows the scope of the claim. (A538-A539.)

Finally, Berk-Tek argued that Tessier '046 taught "substantially enclosed" channels because the reference states that "the projections could extend further towards the jacket," but failed to explain why or how that bare statement would be understood by a person of ordinary skill in the art to show substantially enclosed channels."  (A539.)

27

b.    *"Twisted Pair Conductors and the Non-Conductive Interior Support Are Twisted Together about a Common Axis to Close the Data Communications Cable"*

With regard to the requirement that the "twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the cable," Berk-Tek's Reply again provided only incorrect attorney argument.

For example, Berk-Tek asserted that Tessier '046 did not "at all discuss extruding the core member/body such that it has a helical geometry as suggested by [Belden]." (A540.) In making that argument, however, Berk-Tek simply disregarded portions of Tessier '046 clearly teaching that its core member 22 and body 32 were *formed as helixes* (A181-A194, Tessier '046 at 4:14-17, 4:27-29), and provided no *evidence* that a person of ordinary skill in the art would interpret Tessier '046's disclosures as Berk-Tek's attorneys did.

Berk-Tek then argued that "[t]here is no twisting *step* at all in claims 24 or 29 and thus it is irrelevant if [Tessier]'046 twists the pairs and separator together or pre-twists the separator and then applies the pairs" because "[t]he net result in both cases is a product that has exactly the same structure." (A541.) Again, however, Berk-Tek provided no testimony of a person of ordinary skill in the art to support this assertion. In fact, it is evident that twisting the '575 transmission media and separator together would distort them from their original shape, causing the entire

28

structure to twist and store potential energy that, for example, would cause it to unwind if released and alter the flexibility characteristics.   JP '470, in particular, contradicts Berk-Tek's attorney argument that the structure of Tessier '046's cable with its preformed separator is "exactly the same structure" as the '575 Patent. (A195-A199, JP '470, at A196.)

### c.    Ground 9

With respect to Ground 9, Berk-Tek offered only that the arguments contained in Section C of its Reply also applied to JP '470.  (A542.)  Ground 9, however, concerned anticipation by JP '470, while Section C of the Reply contained only a discussion of Tessier '046.  (A449; A539-A542.)  In addition, Berk-Tek failed to address the facts that JP '470's separator is preformed and that the reference specifically distinguishes its cable from the structure of cables with transmission media that are twisted together with a separator, as in the '575 Patent. (*See, e.g.*, A195-A199, JP '470 at A196.)

### 4.    The Board's Final Written Decision

The Board's Final Written Decision incorrectly interpreted the claims of the '575 Patent and the teachings of the prior art references, and adopted arguments that were not properly set forth in Berk-Tek's Petition or provided in the institution decision, meaning that Belden was deprived of any opportunity to address them.

### a.    *"Channels"*

In its Final Written Decision, the Board first construed the term "channels" by citing the claims of U.S. Patent No. 7,339,116 (the "'116 Patent"), which is the grandparent of the '575 Patent. (A1-A36 at A9-A10.) According to the Board, because the '116 Patent's independent claim 1 recites a separator with projections that define an "open space," and because the '116 Patent's dependent claim 3 states that the open space is selected from "a group consisting of a channel, a groove, a duct, and a passage," the "channel" and "groove" are the same "open space" in the '575 Patent. (A1-A36 at A10.) The Board adopted this argument even though it conflicted with Mr. Gareis' unrebutted declaration, and even though it was not presented in Berk-Tek's Petition, *meaning that Belden never had any opportunity to address it*.

The Board next criticized Belden's testimony and evidence concerning the meaning of "channels" in the '575 Patent, claiming that "channels" could not mean substantially enclosed regions because "each of the independent claims requires the interior support to define the channels, not the separator support in combination with the jacket." (A1-A36 at A12; *see also id.* at A13-A15.) The Board, however, failed to acknowledge that each of independent claims 1, 17, 24, and 29 *also recites a cable jacket*, within which the separator is disposed so that its arms can

30

define enclosed channels, as shown in Figure 1.  (A41-A50, '575 Patent, at 6:51-7:3, 8:3-25, 8:46-9:7, 9:23-10-11.)

The Board also disregarded the fact that (with minor variations to the language) each of independent claims 1, 17, and 24 recite that the ***cable jacket*** "maintains the four twisted pair conductors within the four channels defined by the surface of the non-conductive interior support."  (A41-A50, '575 Patent, at 6:51-7:3, 8:3-25, 8:46-9:7.)

The Board next completely disregarded Mr. Gareis' testimony, stating that "the intrinsic evidence as to the meaning of the claim term 'channel' is unambiguous so that we need not resort to expert testimony."  (A1-A36 at A14.) Thus, the Board disregarded Mr. Gareis' declaration even though the claims must be interpreted from the perspective of a person of ordinary skill in the art, like Mr. Gareis, whose testimony was *unrebutted*.  Even though Mr. Gareis provided a lengthy discussion concerning the "channels" of the '575 Patent (A517-A522 at A520, ¶ 11), the Board simply ignored it on the grounds that it was "conclusory in that it is not supported by a citation to the Specification nor an ordinary meaning." (A1-A36 at A14.)

> **b.    *"Twisted Pair Conductors and the Non-Conductive Interior Support Are Twisted Together about a Common Axis to Close the Data Communications Cable"***

The Final Written Decision states that "[t]he claims do not recite that the claimed structure is the structure produced by twisting the twisted pairs along with the interior support." (A1-A36 at A16.) However, the claims plainly require that the "twisted pair conductors and the non-conductive interior support are *twisted together about a common axis to close the cable*." (*See, e.g.,* A41-A50, '575 Patent, at 6:51-7:3, 8:3-25, 8:46-9:7) (emphasis added).

The Board rejected Mr. Gareis' testimony regarding the cabling process (*i.e.*, that it involved helically twisting the conductor pairs and separator *together* about a common axis), concluding instead that "it is the interior support alone that is 'cabled' to define grooves that accommodate the twisted pairs, and being 'cabled' is not described as twisting the twisted pairs along with the separator." (A1-A36 at A16-A17.) In reaching that conclusion, the Board plainly read out-of-context a portion of the '575 Patent that describes the shape of its separator after cabling. (A41-A50, '575 Patent, at 5:27-31, 28-32.)

With regard to Belden's argument "that helically twisting the twisted pairs along with the interior support, as opposed to separately twisting the components and intertwining them, produces a different structure," the Board stated that there

was "no evidence before us that the structures resulting from these two processes differ." (A1-A36 at A18.)  This improperly shifted the burden to Belden to show that the prior art was different, when the burden should have been on Berk-Tek to show that the prior art met the claim limitation.  It was also wrong, as JP '470's separator is pre-formed and the reference specifically distinguishes its cable from the structure of cables with transmission media that are twisted together with a separator, as the '575 Patent claims.  (A195-A199, JP '470, at A196.)

### c.  Grounds 2-8

The Board concluded that claims 9, 10, 11, 16, 18, 19, 22, 23, 26, 27, 28, 29, 30, 31, 32, 33, and 34 were unpatentable, relying on Tessier '046 as the primary reference in obviousness combinations.  (A1-A36 at A24-A33.)

### d.  Ground 9

For Ground 9, the Final Written Decision failed to recognize that JP '470's "plate body" was manufactured in a preformed twisted shape prior to being placed in a cable with transmission media.  (A195-A199, JP '470, at A196; A485-A510 at A507.)  In addition, the Board failed to recognize that JP '470 specifically distinguished its cable from the structure of cables with transmission media that are twisted together with a separator, as the '575 Patent claims.  (A195-A199, JP '470, at A196.)

Instead, the Board's Final Written Decision incorrectly stated that "[Belden's] contention is premised on the interpretation that claims 29, 31, and 33 call for a process of manufacture regarding the conductors and interior support being twisted together to close the cable." (A1-A36 at A34.)  That is not the argument—a cable that is twisted together is *structurally different* than a cable with a helical core that has conductors placed around it.  There is no evidence to the contrary, which is what would be required to invalidate.

## V. SUMMARY OF THE ARGUMENT

The Board is statutorily authorized to institute IPRs on grounds that are properly set forth in a petition.  *See, e.g.,* 35 U.S.C. § 314(a); 37 C.F.R. §§ 42.2 and 42.104.  Here, the Board instituted the IPR even though Berk-Tek's Petition was supported with attorney argument alone.  In particular, Berk-Tek failed to offer ***any*** testimony of a person of ordinary skill in the art (or any other evidence) about the meaning of the '575 Patent's claims to person of ordinary skill, or about the teachings of the prior art.  As a consequence, the Grounds upon which the Board instituted the IPR were based on misreading of both the '575 Patent and the prior art references.

Belden's Response, supported by Mr. Gareis' declaration, identified the errors of the Petition and the Board's Institution Decision.

In particular, the Response showed that the term "channels," as used in the '575 Patent, would have been understood by a person of ordinary skill in the art to constitute a region that is at least substantially separated by the pair separator/ interior support, such that a substantially enclosed passage is formed in the cable. This feature was not found in the primary reference, Tessier '046, which was relied on in eight of the Board's nine unpatentability Grounds.

In addition, Tessier '046 does not teach a cable in which the "twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the cable." Instead, Tessier '046's cable had a separator with a *preformed* helical shape; the separator was not one that had been *twisted together* with the transmission media.

Even though the Board's Final Written Decision was required to be supported by sound legal reasoning and substantial evidence, the Board inexplicably discounted Belden's *uncontroverted* evidence regarding the meaning of the claims and the teachings of the prior art, in favor of Berk-Tek's unsupported attorney argument. Berk-Tek did not attempt to contest Mr. Gareis' declaration by seeking to cross-examine him, nor did Ber-Tek offer testimony from its own expert.

Additionally, the Board's construction of "channels" resulted from an analysis that appeared *for the first time in the Final Written Decision*, improperly and unfairly depriving Belden of any opportunity to respond to it.

For these reasons, and as further discussed below, the Board's Decision with respect to each of its purported Grounds for unpatentability should be reversed.

## VI.    ARGUMENT

### A.    STANDARD OF REVIEW

In an IPR, "the petitioner [has] the burden of proving a proposition of unpatentability by a preponderance of the evidence."  35 U.S.C. § 316(e).

The Federal Circuit "reviews the Board's legal conclusions *de novo* and its factual findings for substantial evidence."  *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 976-7 (Fed. Cir. 2914).  Claim construction is a question of law that the Federal Circuit reviews without deference.  *See, e.g., In re NTP, Inc.*, 654 F.3d 1268, 1273 (Fed. Cir. 2011).

"Claims should always be read in light of the specification and teachings in the underlying patent."  *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010) (citing *Schiber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 217 (1940)).

Anticipation is a question of fact that is reviewed for substantial evidence.  *See, e.g., In re Suitco Surface*, 606 F.3d at 1259.  "A claim is anticipated only if

each and every element as set forth in the claim is found . . . in a single prior art reference." *Verdegaal Bros. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987). Moreover, "[t]he identical invention must be shown in as complete detail as is contained in the . . . claim." MPEP § 2131 (citing *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989)). The elements must be arranged as required by the claim, *see In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990), and "[a]ll words in a claim must be considered in judging the patentability of that claim against the prior art." MPEP § 2143.03 (citing *In re Wilson*, 424 F.2d 1382, 1385 (CCPA 1970)).

"Whether a claimed invention is unpatentable as obvious under § 103 is a question of law based on underlying findings of fact." *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). The Board's legal conclusion of obviousness is reviewed *de novo*, while its factual findings are reviewed for substantial evidence, where substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). "The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact." *Id.*

"An agency's interpretation of its regulations is neither entitled to deference nor given controlling weight if it is 'plainly erroneous or inconsistent with the

regulation' itself." *AMS Assocs. v. U.S.*, 737 F.3d 1338, 1343 (Fed. Cir. 2013)

(quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)).

### B.    THE BOARD ERRED IN HOLDING THAT CLAIMS 1-9, 12-15, 17, 20, 21, 23 AND 24 OF THE '575 PATENT WERE ANTICIPATED BY TESSIER '046

As to Ground 1, the Board erred for at least the two reasons.  First, the

Board's Decision relied on an improper and erroneous interpretation of the term

"channels," which is contained in each of independent claims 1, 17, and 24.

Second, the Board relied on an erroneous interpretation of "twisted pair conductors

and the non-conductive interior support are twisted together about a common axis

to close the data communications cable," as recited in claim 24.

### 1.    The Board Erroneously Interpreted "Channels"

#### a.    *Belden Was Never Afforded An Opportunity To Address The Reasoning Used By The Board To Interpret This Term*

As observed by the Board in the Order Instituting the IPR, "Berk-Tek [did]

not propose any special construction of any claim term."  (A430.)

In the decision instituting the IPR, the Board determined that "all terms of

claims 1-34 of the '575 Patent have their ordinary and customary meaning as

would be understood by one with ordinary skill in the art."  (A431.)

In its Response, Belden offered Mr. Gareis' declaration to support its

argument that "channels" should be interpreted to mean "a region that is at least

substantially separate by the pair separator/interior support, such that a substantially enclosed passage is formed in [the] cable." (A517-A522 at A520, ¶ 11.) Berk-Tek's Reply made a variety of arguments concerning the proper construction of "channels," but made no reference to the '116 Patent. (A535.)

In the Final Written Decision, however, the Board adopted **new** reasoning regarding the interpretation of the term "channels" based on the claims of the '116 Patent, which was the grandparent of the '575 Patent. (A1-A36 at A8-A10.) In particular, the Board observed that claim 1 of the '116 Patent recites a separator with projections that define an "open space" and concluded that, because dependent claim 3 of that patent states that the open space is selected from "a group consisting of a channel, a groove, a duct, and a passage," the "channel" and "groove" are the "open space" in the '575 Patent. (A1-A36 at A10.) The Board adopted this analysis (which was wrong, as explained below) even though it was based on entirely different claims, in a different patent, and even though it conflicted with Mr. Gareis' unrebutted declaration.

Most importantly, however, the Board adopted this argument despite the fact that **Belden never had any opportunity to address it**. In fact, the '061 Patent and the '116 Patent are Exhibits 3001 and 3002, documents that were made part of the IPR record by the Board **at the time of its Final Written Decision**. (A1-A36 at A9-A10.)

39

Because the Board based its decision on rationale that Belden never had a chance to address, the Board's Final Written Decision regarding unpatentability of claims 1, 17, and 24 (and their dependent claims) was legally erroneous and should be reversed.  *See, e.g., Rambus Inc. v. Rea*, 731 F.3d 1248, 1256 (Fed. Cir. 2013) (holding, in an *inter partes* reexamination, that the Board committed reversible error by adopting a new motivation to combine to which the patent owner did not have a fair opportunity to respond)*; In re Stepan Co.*, 660 F.3d 1341, 1345 (Fed. Cir. 2011) ("Allowing the Board unfettered discretion to designate a new ground of rejection—when it relies upon facts or legal argument not advanced by the examiner—would frustrate the notice requirements of the APA.").

### b.    A "Channel" Is a Region That Is at Least Substantially Separated by the Pair Separator, Such That a Substantially Enclosed Passage Is Formed in the Cable

The Board misconstrued the claim term "channels" by reading it out of context and by incorrectly relying on the claims of the parent '116 Patent, which contain different limitations from those of the '575 Patent, and which the Board misread.  Moreover, in conducting its analysis, the Board improperly ignored Mr. Gareis' unrebutted declaration.

The fundamental problem is that the Board interpreted "channel" to mean the same thing as "groove."  That is demonstrably wrong.

That "channels" and "grooves" are different is confirmed by the fact that the area between separator prongs is a "groove" in the '575 Patent when considering the separator alone, while the term "channel" is reserved for describing the substantially enclosed space that is formed when the jacket is closed around the prongs to enclose the twisted pairs.  (A485-A510 at A498-A502.)  There is no "channel" in the '575 Patent that is not substantially enclosed.  The parent '061 Patent provides further support for this distinction, as its claims 1, 7, and 12 have "channels," while its claim 19 has "an interior support" with a "plurality of pairs of adjacent arms defining a corresponding plurality of ***grooves***."  (A696-A705 at 8:22-43.)

"There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Comark Comm., Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).  In order to overcome this presumption, Berk-Tek or the Board were required to identify something in the record demonstrating that "channels" and "grooves" should be read synonymously. *See, e.g., id.*; *see also Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1335 (Fed. Cir. 2011).  No such evidence was identified.

The Board's assertion that "the '575 Patent does not describe 'channel' as a space defined by the interior support in combination with the jacket" (A1-A36 at A13) cannot be squared with the claims themselves.  Each of independent claims 1,

17, and 24 recites a cable jacket, within which the separator is disposed, that

maintains the conductors in the channels.  (A41-A50, '575 Patent, at 6:64-67

("wherein the outer jacket in combination with the non-conductive interior support

maintains the plurality of twisted pair conductors within the channels"), 8:15-17

("wherein the outer jacket in combination with the non-conductive interior support

maintains the four twisted pair conductors within the four channels"), 9:1-3

("wherein the outer jacket in combination with the non-conductive interior support

maintains the four twisted pair conductors within the four channels").)  The

channels are defined by the arms of the separator and the jacket, as clearly

illustrated in Fig. 1:



(A41-A50, the '575 Patent at A43)

In fact, at the IPR trial, Berk-Tek's counsel admitted that the outer jacket maintains the transmission media in the channels, and that a "groove" does not require that:

MR. SOFER:    Well, what the—obviously if we don't have an outer jacket, you know, these things are free to sort of get out of their recesses. ***So, outer jacket is maintaining them, but it's maintaining them within the recess that is defined by the channel.***

JUDGE LEE:    Yeah, but in the context of a groove, are you saying—I did not understand you to be saying that the jacket has anything to do with the groove. Is that true?

MR. SOFER:    Well, no, ***the jacket is providing the outer perimeter***—perimeter within which, you know—

JUDGE LEE:    Yeah, but a groove doesn't require an outer perimeter.

MR. SOFER:    ***No, groove doesn't require that***.

(A620-A622 at 18:8-21.)  Thus, Berk-Tek's counsel admitted both that the jacket bounds the channel ("maintain[s] [the conductors] within the recess that is defined by the channel") and that a "channel" is not the same thing as a "groove."

In its Final Written Decision, the Board specifically declined to consider Mr. Gareis' declaration, stating that "the intrinsic evidence as to the meaning of the claim term 'channel' is unambiguous so that we need not resort to expert testimony."  (A1-A36 at A14.)  The intrinsic evidence is not "unambiguous," however, at least because of the groove/channel issue.

But even if the intrinsic evidence *was* unambiguous, the claims still would need to be interpreted from the perspective of a person of ordinary skill in the art. *See, e.g., Ferguson Beauregard v. Mega Sys., LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003) ("The words used in the claims must be considered in context and are examined through the viewing glass of a person skilled in the art."); *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001) ("It is important to bear in mind that the viewing glass through which the claims are construed is that of a person skilled in the art.").

In this instance, Mr. Gareis's declaration was the ***only evidence from a person of skill in the art regarding claim interpretation***.  (One would assume that if Berk-Tek could have offered contrary testimony from the perspective of one of skill in the art, it would have.)  The Board provided no reason to ignore Mr. Gareis' declaration, which was not merely that of an "expert," but of a person of ordinary skill in the art.

Mr. Gareis' declaration explained that the cables of Tessier '046 do not have "channels" like in the '575 Patent because "the cables of Tessier have one large cylindrical channel, the core member 20 being located in the center of the channel" and "[t]he projections 24 and spokes 34 of Tessier '046 do not "define" the cylindrical channel, or any other substantially enclosed channel." (A181-A194, Tessier '046, at A192-A193, Figs. 2 and 3; A517-A522 at A520, ¶ 11.)  Again, this

evidence is supported by the '575 Patent's specification, which depicts the substantially enclosed channels in Figure 1.  (A41-A50, '575 Patent, at A43.)

Berk-Tek made no effort to depose Mr. Gareis, who is a current Belden employee.  As Berk-Tek also failed to provide any contrary evidence, Mr. Gareis' explanation of how "channels" would be understood by a person of ordinary skill in the art, as well has his explanation of the teachings of Tessier '046, is **unrebutted**.  *See, e.g., Monolithic Power Sys., Inc. v. O2 Micro Intern. Ltd.*, 558 F.3d 1341, 1350 (Fed. Cir. 2009) ("O2 Micro did not cross-examine Dr. Horenstein on his assertion as to this point, and O2 Micro's own expert did not testify on this subject at all.  Thus, the record stands unrebutted with evidence showing that Henry included a flow-through switch.").

It was improper for the Board to simply ignore Mr. Gareis' declaration as "unnecessary" – instead, his unchallenged testimony should have been accepted.

Choosing instead to ignore both Mr. Gareis and the claims of the '575 Patent, the Board inexplicably turned to the '116 patent, pointing out that claim 1 of that patent recites a separator with projections that define an "open space," and that dependent claim 3 states that the open space is selected from "a group consisting of a channel, a groove, a duct, and a passage."  The Board then concluded that the "channel" and the "groove" are both the "open space" in the '575 Patent.  (A1-A36  at A10.)

This approach was misguided, and the correct analysis confirms that the Board's construction was, in fact, incorrect. Because the "open space" can be either a channel or a groove, those necessarily are not the same thing. An "open space" that was simply a ***groove*** would be like Tessier '046, because its core has only shallow recesses. An "open space" that was a ***channel*** would be like the '575 Patent, because its core forms substantially enclosed channels with the jacket, as shown in, for example, Figure 1.

Ultimately, the only correct reading of the '575 Patent is that its "channels" are substantially enclosed. As there can be no legitimate dispute that Tessier '046 lacks this feature, it cannot anticipate. (*See, e.g.,* A181-A194, Tessier '046, at A192-A193, Figs. 2 and 3; A517-A522 at A520, ¶ 11; A485-A510 at A498-A502.) The Board's anticipation rejection of independent claims 1, 17, and 24 and their dependent claims, 2-9, 12-15, 20, 21, 23, and 26, should be reversed.

> **2. The Board Erroneously Interpreted "Twisted Pair Conductors and the Non-Conductive Interior Support Are Twisted Together About a Common Axis to Close the Data Communications Cable"**

As indicated above, the Board's Final Written Decision relied on an erroneous interpretation of the requirement that the "twisted pair conductors and the non-conductive interior support are twisted together about a common axis to

close the data communications cable" in independent claim 24 and dependent claims 12, 13, 20, and 21.

### a.    Claim Construction

The Board construed this claim language, concluding that "[t]he structure required by the claims is the twisted pairs and the interior support helically twisted together along the length of the cable, and the claims are not limited to a structure produced by a certain method of manufacture." (A1-A36 at A18.)  Belden was not arguing that the claims were limited to "a structure produced by a certain method of manufacture," however.  The point is that the *structure* is different and, in particular, that the cable of Tessier '046 does not have "twisted pairs and the interior support **helically twisted together** along the length of the cable."

### b.    Tessier '046's Separator Is a Helical Preform That Is Not Twisted Together with Transmission Media

As above, Tessier '046's core member 22 and body 32 are **formed as helixes** (A181-A194, Tessier '046, at 4:14-17, 4:27-29), meaning that its core member 22 and body 32 are not a structure "twisted together about a common axis," as in the '575 Patent.  (A41-A50, '575 Patent, at 8:46-9:7; A485-A510 at A498-A502.)

Regarding Tessier '046's second embodiment, the reference specifically states that "[t]he projections 24 and thus the recesses 26 **extend in helical fashion along the core member 20** to allow the pairs 14 to lie within the recesses in

stranded fashion." (A181-A194, Tessier '046, at 4:14-17; A485-A510 at A502-A503.) Similarly, for Tessier '046's third embodiment, the reference explains that "the central core member 20 of the second embodiment is replaced by a spacer means in the form of *a body 32 formed by four helically extending spokes 34*." (A181-A194, Tessier '046, at 4:27-29; A485-A510 at A503.)

In contrast to the core member of Tessier '046, the interior support of the '575 Patent is formed such that the arms extend linearly in an axial direction along the length of the pair separator/interior support, and it is then helically twisted along with the twisted pairs, about a common axis, as a result of the so-called "cabling" process that is used to close the '575 Patent's cable. (A485-A510 at A502-A504; A41-A50, '575 Patent, at 8:46-9:7.)

### c. *The Board Erroneously Found That the Structures of Tessier '046 and the '575 Patent Were the Same*

To support its Decision, the Board dismissed Belden's argument that "twisting the twisted pairs along with the interior support, as opposed to separately twisting the components and intertwining them, produces a different structure." (A1-A36 at A18.) According to the Board, there was "no evidence before us that the structures resulting from these two processes differ." (A1-A36 at A18.) That analysis, however, improperly shifted the burden to Belden. *See, e.g., Rambus*

*Inc.*, 731 F.3d at 1255 (holding the Board committed reversible legal error by "placing the burden on [the patent owner] that its claims were not obvious").

There is no dispute that the cables of Tessier '046 were created by pre-forming a helical separator and then laying the conductors around it. That being the case, the burden should have been on Berk-Tek to show that a cable built that way was a cable in which the core and the conductors were "twisted together about a common axis." Berk-Tek did not even attempt to prove that.

Plainly, being ***twisted together*** is a physical state required by the claims of the '575 Patent. Neither the Board nor Berk-Tek explains how the core and conductors of Tessier '046 meet that limitation and, at the IPR trial, Berk-Tek's counsel admitted that "[t]here could be" a structural difference in the cables of Tessier '046 and the '575 Patent. (A669-A670 at 69:5-10.)

Accordingly, neither Berk-Tek's Petition, nor the Board's Decision are supported by any testimony of a person of ordinary skill in the art, even though it was Berk-Tek's burden to demonstrate unpatentability by a preponderance of the evidence. *See* 35 U.S.C. § 316(e) (stating "the petitioner [has] the burden of proving a proposition of unpatentability by a preponderance of the evidence").

Furthermore, the Board's conjecture that the two structures are identical does not constitute substantial evidence. *See, e.g., K/S HIMPP v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1366 (Fed. Cir. 2014) (explaining that "the Board

49

cannot accept general conclusions about what is 'basic knowledge' or 'common sense' as a replacement for documentary evidence for core factual findings in a determination of patentability") (citing *In re Zurko*, 258 F.3d 1379, 1385-6(Fed. Cir. 2001)); *In re Huai-Hung Kao*, 639 F.3d 1057, 1067 (Fed. Cir. 2011) ("The Board's own conjecture does not supply the requisite substantial *evidence* to support the rejections"); *see also W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540, 1554 (Fed. Cir. 1983) ("Anticipation of inventions set forth in product claims cannot be predicated on mere conjecture respecting the characteristics of products that might result from the practice of processes disclosed in references.").

But while there is ***no*** evidence that the structures are the same, there ***is*** evidence that they are different.

JP '470, which the Board relied on in Ground 9, describes a core where its "material is formed into a reciprocatingly twisted state by slowly changing the facing of both surfaces as the material moves in the longitudinal direction." (A195-A199, JP '470, at A196; A485-A510 at A507-A509.)  JP '470 thus has a preformed helical shape, like Tessier '046.

As background, JP '470 specifically notes the "tendency" to construct cables by stranding twisted pairs or quads together in a helical fashion (as is claimed in the '575 Patent), describing a "so-called alternatively stranded cable with which

units of the wires are stranded in a manner so that the stranding direction is reversed at points in time within a fixed cycle." (A195-A199, JP '470, at A196.)

JP '470 further explains that a *drawback* of this cable structure is that "with such types of cable, in particular when tensile force is applied in the longitudinal direction prior to conducting cable sheathing, a problem occurs in that the stranded cable core becomes unraveled." (A195-A199, JP '470 at A196.) In other words, the structure of a helically twisted cable can cause the cable to unravel, an issue that JP '470 seeks to resolve by using a pre-formed separator that twisted pairs are positioned on either side of, rather than being helically twisted together. (A195-A199, JP '470, at A196 ; A135-A136). This shows that a twisted core is *structurally* different than a core pre-formed as a helix. The Board's Decision failed to address JP '470's disclosure, and is faulty for this further reason.

The Board erred in its interpretation of the '575 Patent's claims, as well as in its reading of the prior art. The cables of Tessier '046 do not meet the requirement the "twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the data communications cable." (A41-A50 at 8:46-9:7, 7:50-57, 8:32-39.) For this further reason, the Board's determination that independent claim 24 and dependent claims 12, 13, 20, and 21 are anticipated should be reversed.

**C.    FOR GROUNDS 2-8, THE BOARD ERRED IN HOLDING THAT CLAIMS 9, 10, 11, 16, 18, 19, 22, 23, 25, 26, 27, 28, 29, 30, 31, 32, 33, AND 34 WERE OBVIOUS OVER TESSIER '046 IN COMBINATION WITH OTHER ART**

As shown above, Tessier '046 lacks "channels" and fails to teach a cable in which the twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the cable.  (*See also* A485-A510 at A504-A506.)  For the reasons identified with respect to Ground 1, the Board's determination that claims incorporating these limitations are obvious are similarly unsupported by substantial evidence, and legally unsound.

For Ground 2, the Board found claims 9-11, 18, 19, 23, 25, and 28 obvious over Tessier '046 and Cheng '467.  (A1-A36 at A26.)  However, each of claims 9, 10, 11, 18, 19, and 23 depend from a claim that requires "channels," which Tessier '046 does not have.  Claims 25 and 28 depend from claim 24, which requires both "channels" and that the "twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the cable," which are not found in Tessier '046.

For Ground 3, the Board found claim 16 to be obvious over Tessier '046 and Burk '710.  (A1-A36 at A27.)  Claim 16, however, is not unpatentable because Tessier '046 fails to disclose the "channels" of claim 1.

For Ground 4, the Board found claims 22 and 27 obvious over Tessier '046 and Cutler '064.  (A1-A36 at A28-A29.)  Claim 22 is not unpatentable for the reasons identified with respect to its independent claim 17 and claim 27 is not unpatentable for the reasons identified with respect to its independent claim 24.

For Ground 5, the Board found claim 26 to be obvious over Tessier '046 and JP '507.  (A1-A36 at A30.)  Claim 26, however, is patentable for the reasons identified with respect to claim 24.

For Ground 6, the Board found claim 29 and dependent claims 31 and 33 obvious over Tessier '046 and McNeill '813.  (A1-A36 at A31.)  Independent claim 29, however, recites both "channels" and that the "twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the cable."

For Ground 7, the Board found claim 30 obvious over Tessier '046, McNeill '813, and Cheng '467.  (A1-A36 at A32.)  Dependent 30 is not unpatentable for the reasons identified with respect to its independent claim 29.

For Ground 8, the Board found claims 32 and 34 obvious over Tessier '046, McNeill '813, and Cutler '064.  (A1-A36 at A32.)  Dependent 32 and 34, however, are not unpatentable for the reasons identified with respect to their independent claim 29.

In short, the findings of Grounds 2-8 relied on the same erroneous interpretations of Tessier '046 as in Ground 1 and should be reversed for the same reasons.

### D.    FOR GROUND 9, THE BOARD ERRED IN HOLDING THAT CLAIMS 29, 31 AND 33 ARE ANTICIPATED BY JP '407

The Board's Final Written Decision on Ground 9, anticipation of claims 29, 31, and 33 by JP '470, is neither support by substantial evidence nor legally sound.

In particular, the Board misapprehended the disclosure of JP '470. The structure of JP '470's cable, with its ***pre-formed*** separator, results in a cable that fails to meet the requirement that "the plurality of twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the cable," as recited in claim 29 (from which claims 31 and 33 depend).

As indicated above, JP '470 specifically teaches that its core "is formed into a reciprocatingly twisted state by slowly changing the facing of both surfaces as the material moves in the longitudinal direction." (A195-A199, JP '470, at A196; A485-A510 at A507-A509.) This means that JP '470's core is manufactured in a fixed helical configuration, before it is included with transmission media in a finished cable.

There is no dispute that this is the case—Berk-Tek's Petition admitted that "[t]he interior support is formed in a manner where the structure is twisted in a

54

reciprocating fashion" and that the "insulated wires, either single wires or pairs, *are positioned on one side of the separator*" (emphasis added).  (A135-A136; A485-A510 at A508.)

JP '470 specifically teaches that the structure of its cable differs from that of a helically twisted together cable, such as that of the '575 Patent.  The reference describes the "tendency" to construct cables by stranding twisted pairs or quads together in a helical fashion (as is claimed in the '575 Patent), a "so-called alternatively stranded cable with which units of the wires are stranded in a manner so that the stranding direction is reversed at points in time within a fixed cycle." (A195-A199, JP '470, at A196.)  JP '470 explains that a particular drawback of this cable structure is that "with such types of cable, in particular when tensile force is applied in the longitudinal direction prior to conducting cable sheathing, a problem occurs in that the stranded cable core becomes unraveled."  (A195-A199, JP '470, at A196.)  In other words, a twisted cable has (unsurprisingly) a tendency to un-twist.

According to JP '470, its invention, which "has been developed in consideration of these points" (A195-A199, JP '470, at A196), includes a *pre-formed* twisted core, where (as even Berk-Tek's Petition described) "insulated wires, either single wires or pairs, *are positioned on one side of the separator.*" (A135-A136.)  Any speculation that the structure of the '575 Patent's "twisted

together" cable is identical to that of JP '470 would be insufficient to constitute substantial evidence, *see, e.g., In re Huai-Hung Kao*, 639 F.3d at 1067 ("The Board's own conjecture does not supply the requisite substantial *evidence* to support the rejections"), and more importantly, is contradicted by the reference itself.

The Board sidestepped the relevant inquiry by incorrectly characterizing Belden's argument as being that "claims 29, 31, and 33 call for a process of manufacture regarding the conductors and interior support being twisted together to close the cable." (A1-A36 at A34.) That was not Belden's argument. Instead, Belden argued (as it does here) that the *structures* of JP '470's cable and claim 29's "twisted together" cable are different. (A485-A510 at A507-A509.)

Because the Board either failed to recognize, or failed to take into account, the fundamental structural differences between JP '470 and the '575 Patent that are explicitly identified in JP '470, its Decision cannot be said to have been supported by substantial evidence or sound legal reasoning. *See, e.g., K/S HIMPP*, 751 F.3d at 1365 ("The determination of patentability of claims with this limitation . . . requires a core factual finding, and as such, requires more than a conclusory statement from either [the patent challenger] or the Board."); *see also Institute Pasteur v. Focarino*, 738 F.3d 1337, 1345 (Fed. Cir. 2013) (concluding that the

Board's decision was not based on substantial evidence where "[t]he Board relied on its misreading of both references, and nothing more").

Ultimately, because JP '470 does not meet the requirement that "the plurality of twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the cable," neither independent claim 29, nor its dependent claims 31 and 33 are anticipated by JP '470, and the Board's contrary finding should be reversed.  (A485-A510 at A509.)

## VII.   CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Because the Board's invalidity findings are both legally and factually incorrect, Belden respectfully requests that this Court reverse the Board's Final Written Decision in its entirety.

Dated: October 3, 2014                    Respectfully submitted,

/s/ Matthew B. Lowrie
Matthew B. Lowrie
Aaron W. Moore
Matthew A. Ambros
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
P: (617) 342-4000
F: (617) 342-4001

*Attorneys for Appellant Belden Inc.*

**ADDENDUM**

Trials@uspto.gov                                          Paper 29
571-272-7822                                     Entered:  April 28, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BERK-TEK LLC
Petitioner

v.

BELDEN TECHNOLOGIES INC.
Patent Owner

_____

Case IPR2013-00058
Patent 7,977,575

_____

Before JAMESON LEE, JOSIAH C. COCKS, and
PHILLIP J. KAUFFMAN, *Administrative Patent Judges*.

KAUFFMAN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Case IPR2013-00058
Patent 7,977,575

## I. BACKGROUND

*A.    Introduction*

On November 19, 2012, Petitioner, Berk-Tek, LLC, filed a petition for *inter partes* review of claims 1-34 of U.S. Patent No. 7,977,575 B2 ("the '575 Patent").[1]  Paper 1.  Petitioner filed a revised petition on November 28, 2012.[2]  Paper 5 ("Pet.").  On May 2, 2013, the Board instituted a trial for each of claims 1-34, on one or more grounds of unpatentability.  Paper 13 ("Dec.").

After institution of trial, Patent Owner filed a patent owner response (Paper 22, "PO Resp."), and did not file a motion to amend.  Petitioner subsequently filed a reply.  Paper 23 ("Pet. Reply").

A consolidated oral hearing resulting in a single transcript was held on January 8, 2014, for this case and for *inter partes* review 2013-00069, a related case involving the same parties.[3]

We have jurisdiction under 35 U.S.C. § 6(c).  This final written decision is issued pursuant to 35 U.S.C. § 318(a).

Claims 1-34 of the '575 Patent are *unpatentable*.

_____

[1]  In the original Petition, Petitioner is identified as "Nexans, Inc."  Paper 1.  On April 18, 2013, Nexans informed the Board that Nexans's successor in interest is "Berk-Tek, LLC."  Paper 12.
[2]  All further references to the Petition are to the revised Petition unless otherwise stated.
[3]  A transcript of the final hearing is included in the record as Paper 28 ("Tr.").

2

Case IPR2013-00058
Patent 7,977,575

B.      *Standard for Decision with Respect to Patentability*

When, as here, an *inter partes* review is instituted and not dismissed,
the Board shall issue a final written decision with respect to the patentability
of any patent claim challenged by Petitioner.  35 U.S.C. § 318(a).  The
standard for determining patentability is set forth in 35 U.S.C. § 316(e),
which provides as follows:

> *(e) Evidentiary standards* - In an inter partes review instituted
> under this chapter, Petitioner shall have the burden of proving a
> proposition of unpatentability by a preponderance of the
> evidence.

C.      *The '575 Patent*

The '575 Patent discloses a high performance data cable.  Ex. 1001,
1:26.  As background, the '575 Patent discloses that many data
communications systems utilize high performance data cables having at least
four twisted pairs (a pair of conductors twisted about each other).  *Id*. at
1:32-36.  These cables must meet exacting specifications with regard to data
speed and electrical characteristics.  *Id*. at 1:39-41.

The cable of the '575 Patent includes an interior support[4] having
grooves that accommodate twisted pair conductors allowing for easy spacing
of the twisted pairs that improves near-end cross-talk (NEXT) and lessens
the need for complex and hard to control lay procedures and individual
shielding.  *Id*. at 1:43; 2:1-9.

_____

[4]  An "interior support" is also referred to as a "star separator" or a
"separator."  *See, e.g.*, Ex. 1001, 1: 27-28; 4:9-10.

3

A3

Case IPR2013-00058
Patent 7,977,575

Figures 1 and 4 of the '575 Patent are reproduced below:



Figures 1 and 4 are vertical cross-sectional views
of the cable and the interior support, respectively.

In this embodiment, interior support 10 includes central region 12 with four prongs or splines 14 that extend both along the longitudinal length of interior support 10 and radially outward from the central region of interior support 10. *Id*. at 4:21-32; figs. 1, 4. Insulated twisted pairs of conductors 34 are disposed within grooves 22 defined by each pair of adjacent prongs

4

Case IPR2013-00058
Patent 7,977,575

14, and run the longitudinal length of interior support 10. *Id*. at 4:51; 5:19-21, 29-32; fig. 1.

D.     *Illustrative Claim*

Of the challenged claims, claims 1, 17, 24, and 29 are independent.

Claim 1 is illustrative, and is reproduced below:

> 1.     An unshielded twisted pair data communications cable comprising:
>
> a plurality of twisted pair conductors configured to carry data communications signals;
>
> a non-conductive interior support consisting of at least one non-conductive material and having a surface that defines a plurality of channels in the data communications cable within which the plurality of twisted pair conductors are individually disposed; and
>
> an outer jacket longitudinally enclosing the plurality of twisted pair conductors and the non-conductive interior support to form the data communications cable, the outer jacket being formed of a non-conductive material;
>
> wherein the outer jacket in combination with the nonconductive interior support maintains the plurality of twisted pair conductors within the channels defined by the surface of the non-conductive interior support; and
>
> wherein the unshielded data cable does not include a shield between the outer jacket and the twisted pair conductors and the non-conductive interior support.

5

Case IPR2013-00058
Patent 7,977,575

*E.     Prior Art References Supporting Alleged Unpatentability of Claims 1-34[5]*

| | | | |
|---|---|---|---|
| Cutler '064 | US 3,209,064 | Sept. 28, 1965 | Ex. 1007 |
| Burk '710 | US 3,888,710 | June 10, 1975 | Ex. 1016 |
| Cheng '467 | US 4,935,467 | June 19, 1990 | Ex. 1012 |
| McNeill '813 | US 5,399,813 | Mar. 21, 1995 | Ex. 1014 |
| Tessier '046 | CA 2,058,046 | Aug. 22, 1992 | Ex. 1002 |
| JP '507 | Sh061(1986)-13507 | Jan. 21, 1986 | Ex. 1006 |
| JP '470 | Sh043(1968)-15470 | June 28, 1968 | Ex. 1003 |

*F.     Pending Grounds of Unpatentability[6]*

| Reference(s) | Basis | Claims |
|---|---|---|
| Tessier '046 | § 102 | 1-9, 12-15, 17, 20, 21, 23, and 24 |
| Tessier '046 and Cheng '467 | § 103 | 9-11, 18, 19, 23, 25, and 28 |
| Tessier '046 and Burk '710 | § 103 | 16 |
| Tessier '046 and Cutler '064 | § 103 | 22 and 27 |
| Tessier '046 and JP '507 | § 103 | 26 |
| Tessier '046 and McNeill '813 | § 103 | 29, 31, and 33 |
| Tessier '046, McNeill '813, and Cheng '467 | § 103 | 30 |

---

[5] Exhibits 1006 and 1003 contain both the Japanese and English version of the reference.

[6] *See* Dec. at 32-33.

A6

Case IPR2013-00058
Patent 7,977,575

| Reference(s) | Basis | Claims |
|---|---|---|
| Tessier '046, McNeill '813, and Cutler '064 | § 103 | 32 and 34 |
| JP '470 | § 102 | 29, 31, and 33 |

## II.  CLAIM INTERPRETATION

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b).  Claim terms are also given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  If an inventor acts as his or her own lexicographer, the definition must be set forth in the specification with reasonable clarity, deliberateness, and precision.  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

The challenge is to interpret claims in view of the specification without unnecessarily importing limitations from the specification into the claims.  *See E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003).  If a feature is not necessary to interpret what the inventor means by a claim term, it is "extraneous" and should not be read into the claim.  *Renishaw PLC*, 158 F.3d at 1249; *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).  The construction that stays true to the claim language and most naturally aligns

7

A7

Case IPR2013-00058
Patent 7,977,575

with the inventor's description is likely the correct interpretation.  *See*
*Renishaw PLC*, 158 F.3d at 1250.

A.      *Channels*

    *1. Board Interpretation*

We begin our claim construction analysis with the claims.  *See*
*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ("It is a
bedrock principle of patent law that the claims of a patent define the
invention to which the patentee is entitled the right to exclude." (citations
and quotations omitted)).

Independent claim 1 is directed to a communications cable that
includes: a plurality of twisted pair conductors, an interior support, and an
outer jacket.  The surface of the interior support defines a plurality of
channels within which the plurality of twisted pair conductors are
individually disposed.

The Specification of the '575 Patent does not provide a
lexicographical definition of "channels."  Indeed, the term "channels" is
used in the claims, but is not used in the remainder of the Specification.  An
ordinary meaning of "channel" is "a long gutter, groove, or furrow."  Ex.
2001; Ex. 2002.  Nothing in the Specification of the '575 Patent is
inconsistent with the ordinary meaning that a channel is a "long gutter,
groove, or furrow."

The '575 Patent is a continuation of application No. 11/877,343, now
U.S. Pat. No. 7,663,061 ("the '061 Patent"), which is a continuation of

8

A8

Case IPR2013-00058
Patent 7,977,575

application No. 09/765,914, now U.S. Pat. No. 7,339,116 ("the '116

Patent"), which is a continuation-in-part of application No. 09/074,272, now

U.S. Pat. No. 6,222,130 ("the '130 Patent"), which is a continuation-in-part

of application No. 08/629,509, now U.S. Pat. No. 5,789,711 (the '711

Patent").  Ex. 1001, 1:7-20.

Because the '575 Patent derives from the same parent application and

shares common terms with the '116 Patent and the '061 Patent, we construe

claim terms in the '575 Patent consistent with their use in the '116 Patent

and the '061 Patent.[7]  *See NTP Inc., v. Research in Motion, Ltd.*, 418 F.3d

1282, 1293 (Fed. Cir. 2005) (When construing claims in patents that derive

from the same parent application and share common terms, "we must

interpret the claims consistently across all asserted patents.").  Further, the

'575 Patent incorporates the '116 Patent and the '061 Patent in their entirety.

Ex. 1001, 1:20-22.

In the '061 Patent, independent claims 1 and 7 are each directed to a

communications cable that includes a separator having a plurality of arms

where each pair of adjacent arms defines a channel, and at least one twisted

pair of the plurality of twisted pairs is located in the channel.  Ex. 3001,

6:42-59; 7:6-26.  Claim 12 contains a similar use of the term channel.  *Id.* at

7:35-8:3.  The term "channel" is not otherwise used in the '061 Patent.

───────────────────

[7] The term "channels" is not used in the '711 Patent or the '130 Patent.

9

Case IPR2013-00058
Patent 7,977,575

In the '116 Patent, independent claim 1 is directed to a data cable that includes an interior support having a plurality of projections where adjacent projections define an "open space," and the plurality of twisted pairs are disposed in each open space. Ex. 3002, 6:45-61. Claim 3 of the '116 Patent depends from independent claim 1 and requires that the open space be one selected from "a group consisting of a channel, a groove, a duct, and a passage." *Id.* at 6:65-67. Independent claim 4 and its dependent claim 6 utilize the claim terms "open space" and "channel" in the same manner. *Id.* at 7:1-15; 8:1-17. The term "channel" is not otherwise used in the '116 Patent.

Independent claims 17, 24, and 29 of the '575 Patent recite uses of the term "channels" similar to that of independent claim 1.

Therefore, in the specific context of these claims, consistent with the '061, '116, and '575 Patents, a channel, as a long gutter, groove, or furrow, is a type of open space defined by the interior support within which at least one of the plurality of twisted pairs is located.

Petitioner's assertion that "channels" are areas in the cable defined by the separator that hold and space the twisted pairs is consistent with our interpretation. Pet. Reply 4-5.

2. *Patent Owner Argument*

Patent Owner argues that "channels" as claimed are substantially enclosed passages formed in the cable by the interior support and the jacket. Ex. 2004, 5; *see also* PO Resp. 10-12.

10

A10

Case IPR2013-00058
Patent 7,977,575

An annotated version of Figure 1 of the '575 Patent from
Patent Owner's Response is reproduced below:



This annotated version of Figure 1 of the '575 Patent
is a cross-sectional view of a cable.

Patent Owner annotated Figure 1 with a dotted line identified as a
"channel."  Patent Owner makes several assertions in support of its claim
interpretation.

*a) Ordinary meaning*

Patent Owner proffers that ordinarily "channel" is understood to mean
either "a usually tubular enclosed passage: CONDUIT," or "an especially
tubular enclosed passage: CONDUIT, PIPE, DUCT <the poison ~ in a
snake's fangs."  PO Resp. 10-11.  Based upon these ordinary meanings,
Patent Owner argues that a "channel" as claimed is a substantially enclosed

11

passage formed in the cable by the interior support and the jacket.  Ex. 2004, 5; *see also* PO Resp. 10-12.

This contention contradicts the plain language of each of the independent claims.  As explained above, each of the independent claims requires the interior support to define the channels, not the interior support in combination with the jacket.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (the claims define the invention).

Patent Owner's claim construction also deviates without justification from the ordinary meaning of "channel" proffered.  The ordinary meaning of "channel" proffered is a tubular enclosed passage, yet Patent Owner asks that "channel" be interpreted as a *substantially* enclosed passage.  As pointed out by Petitioner, the '575 Patent does not contain the word "substantially," nor does the Specification otherwise support such a meaning.  *See* PO Resp. 5.  Further, as detailed below, Patent Owner does not explain cogently how such a deviation from the ordinary meaning of the term "channel" is warranted by the Specification.  *See e.g., In re Translogic Tech., Inc.*, 504 F.3d at 1257 (absent a lexicographical definition, claim terms should be given their ordinary meaning as understood by a person of ordinary skill in the art).

> *b) Specification*

Patent Owner's claim interpretation relies on two portions of the Specification for support.  First, Patent Owner observes that the Specification indicates that each pair of adjacent prongs 14 of interior support 10 defines a groove 22.  PO Resp. 11.  Indeed, the '575 Patent

Case IPR2013-00058
Patent 7,977,575

contains such disclosure.  *See* Ex. 1001, 4:51; fig. 2.  This disclosure does not describe the groove as a substantially enclosed passage formed by the interior support and the jacket.  Further, Patent Owner fails to explain persuasively how this disclosure regarding a groove relates to the scope of the term "channel."

Second, Patent Owner asserts that in the '575 Patent the term "channel" is "reserved for describing the substantially enclosed space that is formed when the jacket is closed about the prongs to enclose the twisted pairs."  PO Resp. 12.  This assertion is incorrect in terms of the structure that defines the channel and in terms of the extent of the channel.  Regarding structure, the '575 Patent does not describe a "channel" as a space defined by the interior support in combination with the jacket.  Rather, as detailed above, the '575 Patent consistently indicates that the interior support defines the channels.  Regarding the extent of the channel, the '575 Patent does not describe "channels" as substantially enclosed passages.

> ### c) Declaration

Patent Owner's claim interpretation also relies on the Declaration of Mr. Gareis, a co-inventor of the '575 Patent.  The Declaration states that a person of ordinary skill in the art of designing twisted pair cables would have understood the term "channel" to mean a substantially enclosed passage in the cable.  Ex. 2003 ¶ 11.  Specifically, the Declaration states:

> [a] person of ordinary skill in the art of designing twisted pair cables would have understood the term 'channel,' as it is used in the '061 Patent to mean a region that is at least substantially separated by the pair separator/interior support, such that a

13

Case IPR2013-00058
Patent 7,977,575

substantially enclosed passage is formed in [the] cable.[8]

Ex. 2003 ¶ 11.

For the reasons that follow, this contention is unpersuasive. First, we note that the statement does not go so far as to assert that "channel" is a term of art; rather, the assertion relates to the meaning of "channel" in light of the Specification. Second, as detailed above, the intrinsic evidence as to the meaning of the claim term "channel" is unambiguous so that we need not resort to expert testimony. *See* Ex. 2003 ¶ 11; *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F3d 701, 705 (Fed. Cir. 1997); *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1126 (Fed. Cir. 1996). Third, the statement is conclusory in that it is not supported by a citation to the Specification or an ordinary meaning. *See* 37 C.F.R. § 42.65(a); *Rohm and Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir 1997).

Having considered the declaration, we find it does not support the claim interpretation proffered by Patent Owner.

#### d) In the Cable

At the hearing, Patent Owner elaborated that a "channel" as claimed is substantially enclosed because the claim recites that the "channels" are "in the data communications cable." Tr. at 31.

---

[8] This declaration refers to the '061 Patent instead of the '575 Patent because it was created for re-examination of U.S. 7,663,061, one of the related patents (now the subject of IPR2013-00069).

14

Case IPR2013-00058
Patent 7,977,575

To begin, we note that only claim 1 contains this language, and for that reason this line of argument is not applicable to independent claims 17, 24, and 29.  *See* Ex 1001 at 6:55-58.

Patent Owner asks that we read the recitation that the channels are "in the data communications cable" to mean that the channel is substantially enclosed and formed by the interior support in combination with the jacket. This assertion contradicts the claim language that recites that the interior support defines the channels.  Additionally, as detailed above, claim 1 does not require that the channel is substantially enclosed.  The recitation that the channels are "in the data communications cable" simply indicates where the channels formed by the interior separator are located (i.e., in the data cable).

> *e)  Conclusion*

For these reasons, we decline to accept Patent Owner's claim construction.

**B.   *Twisted together***

> *1.  Board Interpretation*

>> *a)  Claim Language*

Independent claims 12, 24, and 29 are each apparatus claims directed to a communications cable.

The last clause of independent claim 24 recites, "wherein the four twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the communications cable."  Ex. 1001, 9:5-7.  Independent claim 29 and claim 12 contain similar language.

A15

Case IPR2013-00058
Patent 7,977,575

Ex. 1001, 7:50-53; 9:23-10:11.  Claims 13, 25-28, and 30-34 contain this limitation by virtue of their dependence from claims 12, 24, and 29, respectively.  Ex. 1001, 7:54-57; 9:8-22; 10:12-28.

While the clause at issue begins with the term "wherein," it does not merely state the result of limitations elsewhere recited in the claim.  Only this clause recites that the twisted pair conductors and the interior support are twisted together about a common axis.  Therefore, this clause adds to the patentability or substance of the claim.  *Cf. Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F2d 1165, 1172 (Fed. Cir. 1993).

The claims do not recite that the claimed structure is the structure produced by twisting the twisted pairs along with the interior support, nor do the claims recite that the cable is "cabled."

   *b)  Specification*

The Specification of the '575 Patent does not include a lexicographical definition of the claim phrase "twisted together" or "to close."  Nor does the '575 Patent explicitly describe the process of closing a cable or otherwise describe that the twisted pair conductors are twisted along with the interior support (meaning simultaneous twisting of the conductors with the support).

The '575 Patent indicates that the interior support may be "cabled" (as opposed to "closed") with a helixed or S-Z configuration to define helically twisted grooves that accommodate the twisted pairs.  Ex. 1001, 5:27-32. Thus, it is the interior support alone that is "cabled" to define grooves that accommodate the twisted pairs, and being "cabled" is not described as

16

Case IPR2013-00058
Patent 7,977,575

twisting the twisted pairs along with the separator. More importantly, the claims do not require that the interior support is "cabled"; rather, as noted above, the claims require that the twisted pairs and the interior support are helically twisted together along the length of the cable. The record before us does not contain any persuasive evidence regarding the relationship, if any, between cabling and closing a cable.

### c) Interpretation

The structure required by the claims is the twisted pairs and the interior support twisted together about a common axis along the length of the cable. The claims are not limited to a structure produced by a certain method of manufacture.

### 2. Patent Owner Argument

Patent Owner argues that "twisted together about a common axis to close the cable" requires the interior support to be "twisted along with" the twisted pair conductors about a common axis. PO Resp. 14-16. To illustrate this claim interpretation, Patent Owner argues that Tessier '046's interior support (either core member 22 or body 32) is formed separately as a helix rather than being twisted together with the twisted pair conductors. *Id.*

To the extent that Patent Owner's argument can be seen as a contention that the step of twisting the twisted pairs along with the interior support is claimed, such a contention is unpersuasive because the claims at issue are apparatus claims. *See* Pet. Reply 13 (noting that the claims at issue are product claims and do not cover a process).

17

Case IPR2013-00058
Patent 7,977,575

Patent Owner's argument also can be seen as an assertion that twisting the twisted pairs along with the interior support, as opposed to separately twisting the components and intertwining them, produces a different structure. We have no evidence before us that the structures resulting from these two processes differ. However, we need not make such a determination because nothing in the claim language or the Specification limits the claims to the structure produced by a specified process. As explained above, the claims require that the twisted pairs and the interior support are helically twisted together along the length of the cable, and the claims are not limited to a structure produced by a certain method of manufacture.

### 3. Conclusion

Contrary to Patent Owner's assertions, the structure required by the claims is the twisted pairs and the interior support twisted together about a common axis along the length of the cable, and the claims are not limited to a structure produced by a certain method of manufacture.

## III. PATENTABILITY

*A.    Alleged Anticipation by Tessier '046*

As noted in section I.F. above, Petitioner contends that claims 1-9, 12-15, 17, 20, 21, 23, and 24 are unpatentable as anticipated by Tessier '046. Petitioner provides detailed explanations as to how each claim element, arranged as is recited in these claims, is disclosed by Tessier '046. Pet. 15-16, 30-33; Pet. Reply 1-8, 10-15. Upon review of the Petition, Patent

18

Case IPR2013-00058
Patent 7,977,575

Owner's response, and Petitioner's reply, we determine that Petitioner has shown by a preponderance of the evidence that claims 1-9, 12-15, 17, 20, 21, 23, and 24 are unpatentable under 35 U.S.C. § 102 as anticipated by Tessier '046. Our analysis will focus on the deficiencies alleged by Patent Owner.

To anticipate a patent claim under 35 U.S.C. § 102, "a single prior art reference must expressly or inherently disclose each claim limitation." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008). "It is axiomatic that anticipation of a claim under § 102 can be found only if the prior art reference discloses every element of the claim." *In re King*, 801 F.2d 1324, 1326 (Fed. Cir. 1986).

### 1. *Tessier '046*

Tessier '046 discloses an electrical telecommunications cable. Ex. 1002, 1:2-3. The cable comprises: a plurality of twisted pairs of individually insulated conductors, a spacer means, and an outer jacket. Ex. 1002, 2:1-5; 2:11-20; 3:2-6. The spacer means extends along the axis of the cable and has radially outwardly extending projections that are spaced apart circumferentially and define recess regions in which the conductors are disposed. *Id.*

19

Case IPR2013-00058
Patent 7,977,575

Figures 2 and 3 of Tessier '046 are reproduced below:



Figures 2 and 3 illustrate the second and third
embodiments of Tessier '046, respectively.

In the second embodiment, cable 20 is comprised of jacket 12
surrounding four pairs 14 of insulated conductors 16 and central core
member 20 (both the cable and the central core member are labeled "20" in
figure 2). *Id.* at 3:36-4:4. The central core member "extends axially along
the cable and is formed from a tensile dielectric material." *Id.* at 4:4-5. The
central core member includes central mass 22 and four projections 24, with
concave sides, that are equally angularly placed around the axis of the
central core member and define recesses 26 between them; an individual
twisted pair of the conductors lies in each of the four recesses between the
projections. *Id.* at 4:5-14. "The projections 24 and thus the recesses 26
extend in helical fashion along the core member 20 to allow the pairs 14 to
lie within the recesses in stranded fashion." *Id.* at 4:14-17.

20

Case IPR2013-00058
Patent 7,977,575

The third embodiment is similar to the second embodiment except that in the third embodiment, central core member 20 of the second embodiment is replaced by body 32 formed by four helically extending spokes 34 that lie at right angles to each other in cross-section-shaped ("cruciform fashion"). *Id*. at 4:22-35. Spokes 34 of body 32 form recess regions 36 that accommodate pairs 14 of conductors 16. *Id*. at 4:22-37.

In both the second and third embodiments, jacket 12 holds pairs 14 of conductors 16 in their respective recesses (26, 36). *Id*. at 2:4-5; 4:14-17, 35-37; figs. 2, 3.

2. *Claims 1, 17, and 24*

Patent Owner argues that Tessier '046 discloses one large cylindrical channel with core member 20 being located in the center. PO Resp. 12-13 (modifying Tessier '046's Figures 2 and 3 by removing pairs 14 of insulated conductors 16[9]). Patent Owner does not challenge other aspects of this ground of unpatentability, nor present argument for the dependent claims.[10]

This contention is premised on the interpretation that a "channel" as claimed is a substantially enclosed passage formed by the interior support in combination with the jacket. As explained above, such interpretation is

---

[9] The Patent Owner refers to pairs 14 of insulated conductors 16 as "cables." PO Resp. 12; *see also* Ex. 1002, 3:37-4:1; figs. 2, 3.

[10] The Gareis Declaration contains information regarding "surprisingly good performance" regarding a cable that includes a pair separator with arms that define a channel. Ex 2003 ¶¶ 9-10. Perhaps this disclosure is related to the proceeding the Declaration was originally prepared for. Because the Patent Owner did not present argument related to this data, it has not been further considered.

21

Case IPR2013-00058
Patent 7,977,575

incorrect. Consequently, Patent Owner's argument is unpersuasive because it is not commensurate in scope with the claims at issue. *See In re Self*, 671 F.2d 1344, 1348 (CCPA 1982) ("[A]ppellant's arguments fail from the outset because . . . they are not based on limitations appearing in the claims.").

Tessier '046 discloses a second (cable 20) and third embodiment (cable 30), each including an interior support (central mass 22, body 32) having a surface (radially outwardly extending projections 24 of central mass 22, or spokes 34 of body 32) that define channels (recess regions 26, 34). Ex. 1002, 2:36-3:35; figs. 2, 3. These channels (recess regions 26, 34) permit twisted pairs 14 of conductors 16 to be individually disposed within them. Further, these channels (recess regions 26, 34), in combination with jacket 12, maintain twisted pairs 14 of conductors 16 in their respective channels. Pet. 31; Pet. Reply 6; Tessier '046 at 2:4-5; 4:14-17, 35-37; figs. 2, 3.

For the reasons stated above, we are not persuaded by Patent Owner's arguments as to independent claims 1, 17, and 24. Patent Owner does not address specifically the dependent claims. *See* PO Resp. 6-16. Petitioner provides sufficient explanations and evidence to show that Tessier '046 discloses the additional recited limitations in those claims. *See* Pet. 48-77.

Upon review of the Petition, Patent Owner's response and Petitioner's reply, we determine that Petitioner has shown by a preponderance of the evidence that Tessier '046 anticipates independent claims 1 and 17, and their respective dependent claims 2-9, 14, 15, and 23.

22

A22

Case IPR2013-00058
Patent 7,977,575

> ### 3. Claims 12, 13, 20, 21, and 24

Patent Owner argues that the anticipation rejection of claims 12, 13, 20, 21, and 24 cannot be maintained because the Petition "entirely fails to address" the claim limitation that the four twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the data communications cable. PO Reply 14. To the contrary, the Petition addresses this limitation. *See, e.g.*, Pet. 15 ("the pair separator and twisted pairs are helically twisted along the length of the cable"), 31-32. Petitioner's Reply also addresses this limitation. Pet. Reply 12-15.

Patent Owner also argues that Tessier '046 cannot anticipate these claims because Tessier '046's interior support is manufactured by helically extruding it before it is wrapped in the jacket 12. PO Resp. 14-16.

This argument is premised on the interpretation that the claims are limited to a structure produced by twisting the twisted pairs along with the separator and do not cover a structure produced by separately twisting those components and then intertwining them. As explained above, the claims at issue are not limited in this manner. Thus, Patent Owner's argument is unpersuasive because it is not commensurate in scope with the claims at issue. *See In re Self*, 671 F.2d at 1348.

Upon review of the Petition, Patent Owner's response, and Petitioner's reply, we determine that Petitioner has shown by a preponderance of the evidence that claims 12, 13, 20, 21, and 24 are unpatentable as anticipated by Tessier.

23

A23

Case IPR2013-00058
Patent 7,977,575

*B.*    *Alleged Obviousness over Tessier '046 and Cheng '467*

As noted in section I.F. above, Petitioner contends that claims 9-11, 18, 19, 23, 25, and 28 are unpatentable as obvious over Tessier '046 and Cheng '467. Petitioner provides sufficient explanations and evidence to demonstrate by a preponderance of the evidence that the combination of Tessier '046 and Cheng '467 would have rendered the claimed subject matter obvious to one with ordinary skill in the art. Pet. 15-16, 25-26, 37-38; Pet. Reply 1-8, 10-15.

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

The level of ordinary skill in the art is reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978).

24

A24

Case IPR2013-00058
Patent 7,977,575

### 1. Cheng '467

Cheng '467 discloses polymeric compositions for electrical conductor insulation, cable jackets, and electrical devices.  Ex. 1012, 1:10-14. Materials, including co-polymers, may be extruded into shaped articles and are suitable for use in a communications cable.  Pet. 25-26, 37; Ex. 1012, 4:36-44.  Certain thermoplastic copolymers can be used as cable insulation. Pet. 25-26, 37; Ex. 1012, 2:11-29; 2:45-6:27.  The types of copolymers used in Cheng '467's invention have associated benefits desirable in the art of telecommunications cables, such as "improved flexibility" and "high tensile strength, solvent resistance and other physical properties."  Ex. 1012, 9:34-39.

### 2. Analysis

We have reviewed the parties' arguments and supporting evidence. Petitioner explains and offers supporting evidence as to how the subject matter of the challenged claims would have been obvious over Tessier '046 and Cheng '467.  Our analysis will focus on the deficiencies alleged by Patent Owner.

Regarding all of the claims subject to this ground, Patent Owner repeats the argument that Tessier '046 does not disclose "channels" as claimed.  PO Resp. 16.  This limitation is present in claims 9, 10, 11, 18, 19, 23, 25, and 28 by virtue of their dependence from independent claims 1, 17, and 24.  Consequently, this argument is unpersuasive for the reasons given in the analysis of the respective independent claims in the first ground of unpatentability above.

25

A25

Case IPR2013-00058
Patent 7,977,575

Additionally, with regard to claims 25 and 28, Patent Owner repeats the argument that Tessier '046 does not disclose conductors and a support twisted together as claimed.[11] PO Resp. 16. Claims 25 and 28 depend from independent claim 24, and, therefore, the analysis of claim 24 in the first ground of unpatentability above is equally applicable here.

Upon review of the Petition, Patent Owner's response, and Petitioner's reply, we determine that Petitioner has shown by a preponderance of the evidence that claims 9-11, 18, 19, 23, 25, and 28 are unpatentable under 35 U.S.C. § 103(a) over Tessier '046 and Cheng '467.

C.    *Alleged Obviousness over Tessier '046 and Burk '710*

As noted in section I.F. above, Petitioner contends that claim 16 is unpatentable as obvious over Tessier '046 and Burk '710. Petitioner explains and offers supporting evidence as to how the subject matter of the challenged claims would have been obvious Tessier '046 and Burk '710. Pet. 15-16, 28-29, 36, 38; Pet. Reply 1-8, 10-15.

*1. Burk '710*

Burk '710 discloses filler compositions for electrical cables, particularly for cold filling of telecommunications cables. Ex. 1016, Abstract; 1:5-15; 4:51-54; Pet. 28-29, 38.

---

[11] Because claim 27 is not subject to this ground of unpatentability, we presume Patent Owner intended to make reference to claim 28 rather than claim 27.

26

Case IPR2013-00058
Patent 7,977,575

*2. Analysis*

Having reviewed the parties' arguments and supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence how the subject matter of the challenged claims would have been obvious over Tessier '046 and Burk '710. Our analysis will focus on the deficiencies alleged by Patent Owner.

Patent Owner repeats the argument that Tessier '046 does not disclose "channels" as claimed. PO Resp. 17. This limitation is present in claim 16 by virtue of its dependence from independent claim 1. This argument is unpersuasive for the reasons given in the analysis of independent claim 1 in the first ground of unpatentability above.

Upon review of the Petition, Patent Owner's response and Petitioner's reply, we determine that Petitioner has shown by a preponderance of the evidence that claim 16 is unpatentable under 35 U.S.C. § 103(a) over Tessier '046 and Burk '710.

D.    *Alleged Obviousness over Tessier '046 and Cutler '064*

As noted in section I.F. above, Petitioner contends that claims 22 and 27 are unpatentable as obvious over Tessier '046 and Cutler '064. Petitioner provides sufficient explanations and evidence to demonstrate by a preponderance of the evidence that the combination of Tessier '046 and Cutler '064 would have rendered the claimed subject matter obvious to one with ordinary skill in the art. Pet. 15-16, 20-22, 36, 38; Pet. Reply 1-8, 10-15.

27

A27

Case IPR2013-00058
Patent 7,977,575

*1. Cutler '064*

Cutler '064 discloses an electrical cable for electrical signal transmission purposes. Ex. 1007, 1:10-11. The outer protective coating 28 of the cable may be made of polyvinyl chloride. Pet. 38; Ex. 1007, 3:28-32.

*2. Analysis*

We have reviewed the parties' arguments and supporting evidence. Petitioner explains and offers supporting evidence as to how the subject matter of the challenged claims would have been obvious over Tessier '046 and Cutler '064. Our analysis will focus on the deficiencies alleged by Patent Owner.

Patent Owner repeats the argument that Tessier '046 does not disclose "channels" as claimed. PO Resp. 17. This limitation is present in claims 22 and 27 by virtue of dependence from their respective independent claims, 17 and 24. This argument is unpersuasive for the reasons given in the analysis of the respective independent claims in the first ground of unpatentability above.

Additionally, with regard to claim 27, Patent Owner repeats the argument that Tessier '046 does not disclose twisted pair conductors and an interior support twisted together as claimed. PO Resp. 17. This limitation is present in claim 27 by virtue of its dependence from independent claim 24, and the analysis of this argument for claim 24 in the first ground of unpatentability above is equally applicable here.

Upon review of the Petition, Patent Owner's response, and Petitioner's reply, we determine that Petitioner has shown by a

28

A28

Case IPR2013-00058
Patent 7,977,575

preponderance of the evidence that claims 22 and 27 are unpatentable under
35 U.S.C. § 103(a) over Tessier '046 and Cutler '064.

E.    *Alleged Obviousness over Tessier '046 and JP '507*

As noted in section I.F. above, Petitioner contends that claim 26 is
unpatentable as obvious over Tessier '046 and JP '507.  Petitioner provides
sufficient explanations and evidence to demonstrate by a preponderance of
the evidence that the combination of Tessier '046 and JP '507 would have
rendered the claimed subject matter obvious to one with ordinary skill in the
art.  Pet. 15-16, 20, 36, 39; Pet. Reply 1-8, 10-15.

*1.  JP '507*

JP '507 discloses a cable for communications use that includes a
separator (fibrous cocoon-shaped inclusion 13, or a rope- or tube-shaped
inclusion 14) that extends to the jacket (casing 1).  Pet. 20, 39; Ex. 1006, pp.
1-2, figs. 1a, 1b.

*2. Analysis*

We have reviewed the parties' arguments and supporting evidence.
Petitioner explains and offers supporting evidence as to how the subject
matter of the challenged claims would have been obvious over Tessier '046
and JP '507.  Our analysis will focus on the deficiencies alleged by Patent
Owner.

Patent Owner repeats the arguments that Tessier '046 does not
disclose "channels" or twisted pair conductors and an interior support
twisted together as claimed.  PO Resp. 17.  These limitations are present in

29

Case IPR2013-00058
Patent 7,977,575

claim 26 by virtue of its dependence from independent claim 24.  This
argument is unpersuasive for the reasons given in the analysis of claim 24 in
the first ground of unpatentability above.

Upon review of the Petition, Patent Owner's response, and
Petitioner's reply, we determine that Petitioner has shown by a
preponderance of the evidence that claim 26 is unpatentable under 35 U.S.C.
§ 103(a) over Tessier '046 and JP '507.


F.     *Alleged Obviousness over Tessier '046 and McNeill '813*

As noted in section I.F. above, Petitioner contends that claims 29, 31,
and 33 are unpatentable as obvious over Tessier '046 and McNeill '813.
Petitioner provides sufficient explanations and evidence to demonstrate by a
preponderance of the evidence that the combination of Tessier '046 and
McNeill '813 would have rendered the claimed subject matter obvious to
one with ordinary skill in the art.  Pet. 15-16, 27-28, 36, 38; Pet. Reply 1-8,
10-15.

*1. McNeil '813*

McNeill '813 discloses a high performance electrical communications
cable that meets or exceeds the requirements for Category 5 cable and has at
least two pairs of twisted conductors 16 per channel (elongated chambers
14).  Pet. 27-28, 38; Ex. 1014, 1:4-9; 2:53-55; figs. 1-3.

*2. Analysis*

We have reviewed the parties' arguments and supporting evidence.
Petitioner explains and offers supporting evidence as to how the subject

30

A30

Case IPR2013-00058
Patent 7,977,575

matter of the challenged claims would have been obvious over Tessier '046 and McNeill '813. Our analysis will focus on the deficiencies alleged by Patent Owner.

Patent Owner argues that independent claim 29 and its dependent claims 31 and 33 are patentable over Tessier and McNeill '813 because Tessier '046 does not disclose "channels" or twisted pair conductors and an interior support twisted together as claimed. PO Resp. 18.

As detailed above, the "channels" limitation of claim 29 is similar to that of claim 1. Accordingly, the analysis of claim 1 in the first ground of unpatentability is applicable to claim 29 as well.

The twisted together limitation of claim 29 differs slightly from that of independent claims 1, 17, and 24 in that claim 29 further limits the twist to be helical. As explained in our analysis of claims 1, 17, and 24 in the first ground of patentability above, Petitioner is correct that Tessier's twisted pair conductors and interior support are helically twisted together.

Upon review of the Petition, Patent Owner's response, and Petitioner's reply, we determine that Petitioner has shown by a preponderance of the evidence that claims 29, 31, and 33 are unpatentable under 35 U.S.C. § 103(a) over Tessier '046 and McNeill '813.

G.    *Alleged Obviousness over Tessier '046, McNeill '813, and Cheng '467*

As noted in section I.F. above, Petitioner contends that claim 30 is unpatentable as obvious over Tessier '046, McNeill '813, and Cheng '467.

31

A31

Case IPR2013-00058
Patent 7,977,575

Claim 30 depends from independent claim 29. Petitioner provides sufficient explanations and evidence to demonstrate by a preponderance of the evidence that this combination would have rendered the claimed subject matter obvious to one with ordinary skill in the art. Pet. 15-16, 20-22, 25-26, 36, 38; Pet. Reply 1-8, 10-15. Our analysis will focus on the deficiencies alleged by Patent Owner.

Patent Owner repeats the arguments that Tessier '046 does not disclose "channels" or conductors and a support twisted together as claimed. PO Resp. 18. Patent Owner's argument relates to claim 30 by virtue of its dependence from independent claim 29 and not by virtue of any additional limitations of claim 29. These arguments are unpersuasive for the reasons given in the analysis of independent claim 29 in the sixth ground of unpatentability above.

Upon review of the Petition, Patent Owner's response, and Petitioner's reply, we determine that Petitioner has shown by a preponderance of the evidence that claim 30 is unpatentable under 35 U.S.C. § 103(a) over Tessier '046, McNeill '813, and Cheng '467.

H.    *Alleged Obviousness over Tessier '046, McNeill '813, and Cutler '064*

As noted in section I.F. above, Petitioner contends that claim 32 and 34 are unpatentable as obvious over Tessier '046, McNeill '813, and Cutler '064. Petitioner provides sufficient explanations and evidence to demonstrate by a preponderance of the evidence that this combination would

32

Case IPR2013-00058
Patent 7,977,575

have rendered the claimed subject matter obvious to one with ordinary skill in the art. Pet. 15-16, 20-22, 36, 38-39; Pet. Reply 1-8, 10-15. Our analysis will focus on the deficiencies alleged by Patent Owner.

Patent Owner repeats the arguments that Tessier '046 does not disclose "channels" or conductors and a support twisted together as claimed. PO Resp. 18. These limitations are present in claims 32 and 34 by virtue of its dependence from independent claim 29. This argument is unpersuasive for the reasons given in the analysis of claim 29 in the sixth ground of unpatentability above.

Upon review of the Petition, Patent Owner's response, and Petitioner's reply, we determine that Petitioner has shown by a preponderance of the evidence that claims 32 and 34 are unpatentable under 35 U.S.C. § 103(a) over Tessier '046, McNeill '813, and Cutler '064.

I.    *Alleged Anticipation by JP '470*

As noted in section I.F. above, Petitioner contends that claims 29, 31, and 33 are unpatentable as anticipated by JP '470. Petitioner provides detailed explanations as to how each claim element, arranged as is recited in these claims, is disclosed by JP '470. Pet. 16-17, 33-34; Pet. Reply 1-8, 10-15. Upon review of the Petition, Patent Owner's response, and Petitioner's reply, we determine that Petitioner has shown by a preponderance of the evidence that claims 29, 31, and 33 are anticipated by JP '470.

33

Case IPR2013-00058
Patent 7,977,575

### 1. JP '470

JP '470 discloses a cable that includes a plurality of twisted pair conductors (stranded groupings of wires 1) disposed within channels (furrows) provided in a non-conductive, unshielded interior support (core material 2). Pet. 16-17, 33-34; JP '470 at p. 1; figs. 1-2. The twisted pair conductors (wires 1) and interior support (core material 2) are helically twisted together (formed in a "reciprocatingly twisted shape") about a common axis, and are longitudinally enclosed by an outer jacket (cable sheath 4). Pet. 16-17, 33-34; Ex. 1003, p. 1; figs. 1-2.

### 2. Analysis

We have reviewed the parties' arguments and supporting evidence. Petitioner explains and offers supporting evidence as to how the challenged claims are anticipated by JP '470. Our analysis will focus on the deficiencies alleged by Patent Owner.

Paralleling the argument made with regard to Tessier '046, Patent Owner argues that JP '470 is not manufactured as required by claim 29. PO Resp. 19-21.

Patent Owner's contention is premised on the interpretation that claims 29, 31, and 33 call for a process of manufacture regarding the conductors and interior support being twisted together to close the cable. As explained above, Patent Owner's argument is unpersuasive because it is not commensurate in scope with the claims at issue.

34

Case IPR2013-00058
Patent 7,977,575

We note that claims 29, 31, and 33 recite "grooves" rather than "channels" and Patent Owner does not argue that JP '470 does not disclose "grooves" as claimed.

Upon review of the Petition, Patent Owner's response, and Petitioner's reply, we determine that Petitioner has shown by a preponderance of the evidence that claims 29, 31, and 33 are anticipated by JP '470.

## IV. CONCLUSION

Petitioner has met its burden of proof by a preponderance of the evidence in showing under 35 U.S.C. § 103 that: (1) claims 1-9, 12-15, 17, 20, 21, 23, and 24 are unpatentable as anticipated by Tessier '046; (2) claims 9-11, 18, 19, 23, 25, and 28 are unpatentable as obvious over Tessier '046 and Cheng '467; (3) claim 16 is unpatentable as obvious over Tessier '046 and Burk '710; (4) claims 22 and 27 are unpatentable as obvious over Tessier '046 and Cutler '064; (5) claim 26 is unpatentable as obvious over Tessier '046 and JP '507; (6) claims 29, 31, and 33 are unpatentable as obvious over Tessier '046 and McNeill '813; (7) claim 30 is unpatentable as obvious over Tessier '046, McNeill '813, and Cheng '467; (8) claims 32 and 34 are unpatentable as obvious over Tessier '046, McNeill '813, and Cutler '064; and (9) claims 29, 31, and 33 are unpatentable as anticipated by JP '470.

A35

Case IPR2013-00058
Patent 7,977,575

## V. ORDER

In consideration of the foregoing, it is

ORDERED that claims 1-34 of U.S. Patent 7,977,575 are

unpatentable; and

FURTHER ORDERED that because this is a final written decision,

parties to the proceeding seeking judicial review of the decision must

comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER

Joseph Sofer
Robert Haroun
James Blank
David Soofian
SOFER & HAROUN L.L.P
joesofer@soferharoun.com
james.blank@kayescholer.com
david.soofian@kayescholer.com

For PATENT OWNER

Matthew B. Lowrie
Aaron W. Moore
FOLEY & LARDNER LLP
mlowrie-PTAB@foley.com
amoore-PTAB@foley.com

Vsh

36

A36

Trials@uspto.gov                                    Paper No. 30
571-272-7822                                        Entered:  June 5, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
———————

BERK-TEK LLC
Petitioner

v.

BELDEN TECHNOLOGIES INC.
Patent Owner
———————

Case IPR2013-00058
Patent 7,977,575
———————

Before PATRICK E. BAKER, *Trial Paralegal.*

ERRATA

The April 28, 2014, Final Written Decision (hereinafter "Decision") is revised as follows to correct the following typographical error:

On page 36 of the Decision, under the heading of "For PETITIONER," attorneys for the Petitioner Messrs. James Blank and David Soofian were incorrectly named as members of the law firm Sofer & Haroun L.L.P.  In addition, under the same heading,  the email address for Mr.

A37

Case IPR2013-00058
Patent 7,977,575

Robert Haroun was inadvertently omitted.  Therefore, the attorney listing under the "For PETITIONER" heading at page 36 of the Decision is withdrawn and replaced with the following new listing:

For PETITIONER

Joseph Sofer
Robert Haroun
SOFER & HAROUN L.L.P
joesofer@soferharoun.com
rharoun@soferharoun.com

James Blank
David Soofian
KAYE SCHOLER LLP
james.blank@kayescholer.com
david.soofian@kayescholer.com


All other portions of the Decision remain unchanged.  Any confusion caused by the above-noted error is regrettable.

Case IPR2013-00058
Patent 7,977,575

For PETITIONER:

Joseph Sofer
Robert Haroun
SOFER & HAROUN L.L.P
joesofer@soferharoun.com
rharoun@soferharoun.com

James Blank
David Soofian
KAYE SCHOLER LLP
james.blank@kayescholer.com
david.soofian@kayescholer.com


For PATENT OWNER:

Matthew B. Lowrie
Aaron W. Moore
FOLEY & LARDNER LLP
mlowrie-PTAB@foley.com
amoore-PTAB@foley.com

3



US007977575B2

(12) **United States Patent**
Gareis et al.

(10) Patent No.:     **US 7,977,575 B2**
(45) Date of Patent:     *Jul. 12, 2011

(54) **HIGH PERFORMANCE DATA CABLE**

(75) Inventors: **Galen Mark Gareis**, Oxford, OH (US);
**Paul Z Vanderlaan**, Oxford, OH (US)

(73) Assignee: **Belden Inc.**, St. Louis, MO (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

This patent is subject to a terminal dis-
claimer.

(21) Appl. No.: **12/646,657**

(22) Filed: **Dec. 23, 2009**

(65) **Prior Publication Data**

US 2010/0096160 A1     Apr. 22, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/877,343, filed on
Oct. 23, 2007, now Pat. No. 7,663,061, which is a
continuation of application No. 09/765,914, filed on
Jan. 18, 2001, now Pat. No. 7,339,116, which is a
continuation-in-part of application No. 09/074,272,
filed on May 7, 1998, now Pat. No. 6,222,130, which is
a continuation-in-part of application No. 08/629,509,
filed on Apr. 9, 1996, now Pat. No. 5,789,711.

(51) **Int. Cl.**
*H01B 7/00*     (2006.01)

(52) **U.S. Cl.** ............... **174/110 R**; 174/113 C; 174/115;
174/116

(58) **Field of Classification Search** ............. 174/110 R,
174/113 R, 113 C, 120 R, 131 AS, 131 A,
174/115, 116 R, 112
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 867,659 | A | 10/1907 | Hoopes et al. |
| 1,008,370 | A | 11/1911 | Robillot |
| 1,132,452 | A | 3/1915 | Davis |
| 1,700,606 | A | 1/1929 | Beaver |
| 1,940,917 | A | 12/1933 | Okazaki |

(Continued)

FOREIGN PATENT DOCUMENTS

CA     2058046 A1     8/1992

(Continued)

OTHER PUBLICATIONS

Bell Communications Research TA-TSY-00020, Issue 5, Aug. 1986.

(Continued)

*Primary Examiner* — William H Mayo, III
(74) *Attorney, Agent, or Firm* — Lando & Anastasi, LLP

(57)     **ABSTRACT**

A high performance data cable which has an interior support
or star separator. The star separator or interior support extends
along the longitudinal length of the data cable. The star sepa-
rator or interior support has a central region. A plurality of
prongs or splines extend outward from the central region
along the length of the central region. Each prong or spline is
adjacent with at least two other prongs or splines. The prongs
or splines may be helixed or S-Z shaped as they extend along
the length of the star separator or interior support. Each pair of
adjacent prongs or splines defines grooves which extend
along the longitudinal length of the interior support. At least
two of the grooves have disposed therein an insulated con-
ductor. The interior support can have a first material and a
different second material. The different second material
forms an outer surface of the interior support.

**34 Claims, 3 Drawing Sheets**





**US 7,977,575 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,995,201 A | 3/1935 | Delen |
| 2,149,772 A | 3/1939 | Hunter et al. |
| 2,218,830 A | 10/1940 | Rose et al. |
| 2,501,457 A | 3/1950 | Thelin |
| 3,055,967 A | 9/1962 | Bondon |
| 3,209,064 A | 9/1965 | Cutler |
| 3,259,687 A | 7/1966 | Oatess et al. |
| 3,363,047 A | 1/1968 | Grove |
| 3,610,814 A | 10/1971 | Peacock |
| 3,644,659 A | 2/1972 | Campbell |
| 3,921,378 A | 11/1975 | Spicer et al. |
| 4,257,675 A | 3/1981 | Nakagome et al. |
| 4,361,381 A | 11/1982 | Williams |
| 4,385,485 A | 5/1983 | Youechi |
| 4,401,366 A | 8/1983 | Hope |
| 4,401,845 A | 8/1983 | Odhner et al. |
| 4,446,689 A | 5/1984 | Hardin et al. |
| 4,447,122 A | 5/1984 | Sunehall |
| 4,456,331 A | 6/1984 | Whitehead et al. |
| RE32,225 E | 8/1986 | Neuroth et al. |
| 4,645,628 A | 2/1987 | Gill |
| 4,661,406 A | 4/1987 | Gruhn et al. |
| 4,710,594 A | 12/1987 | Walling et al. |
| 4,719,319 A * | 1/1988 | Tighe, Jr. .............. 174/103 |
| 4,755,629 A | 7/1988 | Beggs et al. |
| 4,784,461 A | 11/1988 | Abe et al. |
| 4,784,462 A | 11/1988 | Priaroggia |
| 4,807,962 A * | 2/1989 | Arroyo et al. .............. 385/105 |
| 5,000,539 A | 3/1991 | Garcis |
| 5,087,110 A | 2/1992 | Inagaki et al. |
| 5,132,488 A * | 7/1992 | Tessier et al. .............. 174/34 |
| 5,149,915 A | 9/1992 | Brunker et al. |
| 5,162,609 A | 11/1992 | Adriaenssens et al. |
| 5,212,350 A | 5/1993 | Gebs |
| 5,355,427 A | 10/1994 | Garcis et al. |
| 5,424,491 A | 6/1995 | Walling et al. |
| 5,486,649 A | 1/1996 | Garcis |
| 5,557,698 A | 9/1996 | Garcis et al. |
| 5,574,250 A * | 11/1996 | Hardie et al. .............. 174/36 |
| 5,670,748 A | 9/1997 | Gingue et al. |
| 5,696,295 A * | 12/1997 | Wulff et al. .............. 568/724 |
| 5,699,467 A | 12/1997 | Kojima et al. |
| 5,763,823 A | 6/1998 | Sickierka et al. |
| 5,789,711 A | 8/1998 | Gaeris et al. |
| 5,883,334 A | 3/1999 | Newmoyer et al. |
| 5,952,615 A * | 9/1999 | Prudhon .............. 174/113 C |
| 6,074,503 A | 6/2000 | Clark et al. |
| 6,091,025 A | 7/2000 | Cotter et al. |
| 6,099,345 A | 8/2000 | Milner et al. |
| 6,140,587 A | 10/2000 | Sackett |
| 6,150,612 A * | 11/2000 | Grandy et al. .............. 174/113 C |
| 6,162,992 A | 12/2000 | Clark et al. |
| 6,211,467 B1 | 4/2001 | Berelsman et al. |
| 6,248,954 B1 | 6/2001 | Clark et al. |
| 6,288,340 B1 | 9/2001 | Arnould |
| 6,300,573 B1 | 10/2001 | Horie et al. |
| 6,303,867 B1 | 10/2001 | Clark et al. |
| 6,365,836 B1 | 4/2002 | Blouin et al. |
| 6,506,976 B1 | 1/2003 | Neveux, Jr. |
| 6,570,095 B2 | 5/2003 | Clark et al. |
| 6,596,944 B1 | 7/2003 | Clark et al. |
| 6,624,359 B2 | 9/2003 | Bahlmann et al. |
| 6,639,152 B2 | 10/2003 | Glew et al. |
| 6,686,537 B1 | 2/2004 | Gareis et al. |
| 6,687,437 B1 | 2/2004 | Starnes et al. |
| 6,770,819 B2 | 8/2004 | Patel |
| 6,787,697 B2 | 9/2004 | Stipes et al. |
| 6,800,811 B1 | 10/2004 | Boucino |
| 6,815,611 B1 | 11/2004 | Gareis |
| 6,818,832 B2 | 11/2004 | Hopkinson et al. |
| 6,855,889 B2 | 2/2005 | Gareis |
| 6,888,070 B1 | 5/2005 | Prescott |

| | | |
|---|---|---|
| 6,897,382 B2 | 5/2005 | Hager et al. |
| 6,974,913 B2 | 12/2005 | Bahlmann et al. |
| 6,998,537 B2 | 2/2006 | Clark et al. |
| 7,049,523 B2 | 5/2006 | Shuman et al. |
| 7,064,277 B1 | 6/2006 | Lique et al. |
| 7,098,405 B2 | 8/2006 | Glew |
| 7,109,424 B2 | 9/2006 | Nordin et al. |
| 7,115,815 B2 | 10/2006 | Kenny et al. |
| 7,135,641 B2 | 11/2006 | Clark |
| 7,145,080 B1 | 12/2006 | Boisvert et al. |
| 7,154,043 B2 | 12/2006 | Clark |
| 7,173,189 B1 | 2/2007 | Hazy et al. |
| 7,179,999 B2 | 2/2007 | Clark et al. |
| 7,196,271 B2 | 3/2007 | Cornibert et al. |
| 7,208,683 B2 | 4/2007 | Clark |
| 7,214,884 B2 | 5/2007 | Kenny et al. |
| 7,220,918 B2 | 5/2007 | Kenny et al. |
| 7,238,885 B2 | 7/2007 | Lique et al. |
| 7,244,893 B2 | 7/2007 | Clark |
| 7,271,342 B2 | 9/2007 | Stutzman et al. |
| 7,317,163 B2 | 1/2008 | Lique et al. |
| 7,329,815 B2 | 2/2008 | Kenny et al. |
| 7,339,116 B2 | 3/2008 | Gareis |
| 7,358,436 B2 | 4/2008 | Dellagala et al. |
| 7,390,971 B2 | 6/2008 | Jean et al. |
| 7,405,360 B2 | 7/2008 | Clark et al. |
| 7,491,888 B2 | 2/2009 | Clark et al. |
| 7,507,910 B2 | 3/2009 | Park et al. |
| 7,534,954 B2 | 5/2009 | Clark et al. |
| 2003/0230427 A1 | 12/2003 | Gareis |
| 2004/0050578 A1 | 3/2004 | Hudson |
| 2006/0131058 A1 | 6/2006 | Lique et al. |
| 2006/0243477 A1 | 11/2006 | Jean et al. |
| 2007/0044994 A1 | 3/2007 | Park et al. |
| 2007/0209823 A1 | 9/2007 | Vexler et al. |
| 2008/0041609 A1 | 2/2008 | Gareis et al. |
| 2008/0164049 A1 | 7/2008 | Vexler et al. |
| 2009/0133895 A1 | 5/2009 | Allen |
| 2009/0173514 A1 | 7/2009 | Gareis |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 697378 | 10/1940 |
| EP | 1 107 262 A2 | 6/2000 |
| EP | 1 085 530 A2 | 3/2001 |
| EP | 1 162 632 A2 | 12/2001 |
| EP | 1 215 688 A1 | 6/2006 |
| GB | 342606 | 2/1931 |
| JP | 1942-10582 | 9/1942 |
| JP | S29-15973 | 12/1955 |
| JP | SHO56-1981-7307 | 1/1981 |
| JP | SHO56-1981-8011 | 1/1981 |
| JP | SHO61-1986-13507 | 1/1986 |
| JP | 11-53958 | 2/1999 |
| WO | 9624143 A1 | 8/1996 |
| WO | 9848430 A1 | 10/1998 |
| WO | 0051142 A1 | 8/2000 |
| WO | 0079545 A1 | 12/2000 |
| WO | 0108167 A1 | 2/2001 |
| WO | 0154142 A1 | 7/2001 |
| WO | 03077265 A1 | 9/2003 |
| WO | 03094178 A1 | 11/2003 |
| WO | 2005048274 A2 | 5/2005 |

## OTHER PUBLICATIONS

Hawley, The Condensed Chemical Dictionary, Tenth Edition, 1981, pp. 471, 840, 841.

Refi, James J., Fiber Optic Cable: A Lightguide, AT&T Specialized Series, Jan. 1991, pp. 79-80.

C&M Corporation Engineering Design Guide, 3rd Edition, 1992, p. 11.

Hitachi Cable Manchester, Apr. 23, 1997, pp. 1-5.

* cited by examiner

**FIG. 1**

**FIG. 1A**

**FIG. 2**





FIG. 3

FIG. 4

# FIG. 5



US 7,977,575 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# HIGH PERFORMANCE DATA CABLE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of, and claims priority under 35 U.S.C. §120 to, U.S. application Ser. No. 11/877,343 entitled "HIGH PERFORMANCE DATA CABLE," filed Oct. 23, 2007 now U.S. Pat. No. 7,663,061, which is a continuation of, and claims priority to, U.S. application Ser. No. 09/765,914 entitled "HIGH PERFORMANCE DATA CABLE," filed Jan. 18, 2001 now U.S. Pat. No. 7,339,116, which is a continuation-in-part of, and claims priority to, U.S. application Ser. No. 09/074,272 entitled "HIGH PERFORMANCE DATA CABLE," filed May 7, 1998 now U.S. Pat. No. 6,222,130, which is a continuation-in-part of, and claims priority to, U.S. application Ser. No. 08/629,509 entitled "HIGH PERFORMANCE DATA CABLE," filed Apr. 9, 1996 now U.S. Pat. No. 5,789,711. Each of the above-identified patents and patent applications is herein incorporated by reference in its entirety.

## FIELD OF INVENTION

This invention relates to a high performance data cable utilizing twisted pairs. The data cable has an interior support or star separator around which the twisted pairs are disposed.

## BACKGROUND OF THE INVENTION

Many data communication systems utilize high performance data cables having at least four twisted pairs. Typically, two of the twisted pairs transmit data and two of the pairs receive data. A twisted pair is a pair of conductors twisted about each other. A transmitting twisted pair and a receiving twisted pair often form a subgroup in a cable having four twisted pairs.

A high performance data cable utilizing twisted pair technology must meet exacting specifications with regard to data speed and electrical characteristics. The electrical characteristics include such things as controlled impedance, controlled near-end cross-talk (NEXT), controlled ACR (attenuation minus cross-talk) and controlled shield transfer impedance.

One way twisted pair data cables have tried to meet the electrical characteristics, such as controlled NEXT, is by utilizing individually shielded twisted pairs (ISTP). These shields insulate each pair from NEXT. Data cables have also used very complex lay techniques to cancel E and B fields to control NEXT. Finally, previous data cables have tried to meet ACR requirements by utilizing very low dielectric constant insulations. The use of the above techniques to control electrical characteristics has problems.

Individual shielding is costly and complex to process. Individual shielding is highly susceptible to geometric instability during processing and use. In addition, the ground plane of individual shields, 360 degree, in ISTP's, lessens electrical stability.

Lay techniques are also complex, costly and susceptible to instability during processing and use.

Another problem with many data cables is their susceptibility to deformation during manufacture and use. Deformation of the cable's geometry, such as the shield, lessens electrical stability. Applicant's unique and novel high performance data cable meets the exacting specifications required of a high performance data cable while addressing the above problems.

This novel cable has an interior support with grooves. Each groove accommodates at least one signal transmission conductor. The signal transmission conductor can be a twisted pair conductor or a single conductor. The interior support provides needed structural stability during manufacture and use. The grooves also improve NEXT control by allowing for the easy spacing of the twisted pairs. The easy spacing lessens the need for complex and hard to control lay procedures and individual shielding.

The interior support allows for the use of a single overall foil shield having a much smaller ground plane than individual shields. The smaller ground plane improves electrical stability. For instance, the overall shield improves shield transfer impedance. The overall shield is also lighter, cheaper and easier to terminate than ISTP designs.

The interior support can have a first material and a different second material. The different second material forms the outer surface of the interior support and thus forms the surface defining the grooves. The second material is generally a foil shield and helps to control electricals between signal transmission conductors disposed in the grooves. The second material, foil shield, is used in addition to the previously mentioned overall shield.

This novel cable produces many other significant advantageous results such as: improved impedance determination because of the ability to precisely place twisted pairs; the ability to meet a positive ACR value from twisted pair to twisted pair with a cable that is no larger than an ISTP cable; and an interior support which allows for a variety of twisted pair dimensions.

Previous cables have used supports designed for coaxial cables. The supports in these cables are designed to place the center conductor coaxially within the outer conductor. The supports of the coaxial designs are not directed towards accommodating signal transmission conductors. The slots in the coaxial support remain free of any conductor. The slots in the coaxial support are merely a side effect of the design's direction to center a conductor within an outer conductor with a minimal material cross section to reduce costs. In fact, one would really not even consider these coaxial cable supports in concurrence with twisted pair technology.

## SUMMARY OF THE INVENTION

In one embodiment, we provide a data cable which has a one piece plastic interior support. The interior support extends along the longitudinal length of the data cable. The interior support has a central region which extends along the longitudinal length of the interior support. The interior support has a plurality of prongs. Each prong is integral with the central region. The prongs extend along the longitudinal length of the central region and extend outward from the central region. The prongs are arranged so that each prong of said plurality is adjacent with at least two other prongs.

Each pair of adjacent prongs define a groove extending along the longitudinal length of the interior support. The prongs have a first and second lateral side. A portion of the first lateral side and a portion of the second lateral side of at least one prong converge towards each other.

The cable further has a plurality of insulated conductors disposed in at least two of the grooves.

A cable covering surrounds the interior support. The cable covering is exterior to the conductors.

Applicant's inventive cable can be alternatively described as set forth below. The cable has an interior support extending along the longitudinal length of the data cable. The interior support has a central region extending along the longitudinal

A46

US 7,977,575 B2

3

length of the interior support. The interior support has a plurality of prongs. Each prong is integral with the central region. The prongs extend along the longitudinal length of the central region and extend outward from the central region. The prongs are arranged so that each prong is adjacent with at least two other prongs.

Each prong has a base. Each base is integral with the central region. At least one of said bases has a base which has a horizontal width greater than the horizontal width of a portion of said prong above said base. Each pair of the adjacent prongs defines a groove extending along the longitudinal length of the interior support.

A plurality of conductors is disposed in at least two of said grooves.

A cable covering surrounds the interior support. The cable covering is exterior to the conductors.

The invention can further be alternatively described by the following description. An interior support for use in a high-performance data cable. The data cable has a diameter of from about 0.300" to about 0.400". The data cable has a plurality of insulated conductor pairs.

The interior support in said high-performance data cable has a cylindrical longitudinally extending central portion. A plurality of splines extends radially outward from the central portion. The splines also extend along the length of the central portion. The splines have a triangular cross-section with the base of the triangle forming part of the central portion, each triangular spline has the same radius. Adjacent splines are separated from each other to provide a cable chamber for at least one pair of conductors. The splines extend longitudinally in a helical, S, or Z-shaped manner.

An alternative embodiment of applicant's cable can include an interior support having a first material and a different second material. The different second material forms an outer surface of the interior support. The second material conforms to the shape of the first material. The second material can be referred to as a conforming shield because it is a foil shield which conforms to the shape defined by the outer surface of the first material.

Accordingly, the present invention desires to provide a data cable that meets the exacting specifications of high performance data cables, has a superior resistance to deformation during manufacturing and use, allows for control of near-end cross talk, controls electrical instability due to shielding, and can be a 500 MHz cable with a positive ACR ratio.

It is still another desire of the invention to provide a cable that does not require individual shielding, and that allows for the precise spacing of conductors such as twisted pairs with relative ease.

It is still a further desire of the invention to provide a data cable that has an interior support that accommodates a variety of AWG's and impedances, improves crush resistance, controls NEXT, controls electrical instability due to shielding, increases breaking strength, and allows the conductors such as twisted pairs to be spaced in a manner to achieve positive ACR ratios.

Other desires, results, and novel features of the present invention will become more apparent from the following drawing and detailed description and the accompanying claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a vertical cross-sectional view taken along a plane of one embodiment of this invention.

FIG. 1a is a blow up of a portion of the cross section shown in FIG. 1.

4

FIG. 2 is a top right perspective view of this invention. The view shows the cable cut away to expose its various elements. The view further shows the helical twist of the prongs or splines.

FIG. 3 is a vertical cross-section of the interior support or star separator showing some of the dimensions of the interior support or star separator.

FIG. 4 is a vertical cross-section of the interior or star separator support showing the features of the prongs or splines.

FIG. 5 is a vertical cross-section of an alternative embodiment of an interior support or star separator showing the conforming foil shield which makes up the second material of the interior support.

DETAILED DESCRIPTION

The following description will further help to explain the inventive features of this invention.

FIG. 1 is a vertical cross-section of one embodiment of this novel cable. The shown embodiment has an interior support or star separator (10). The interior support or star separator runs along the longitudinal length of the cable as can be seen in FIG. 2. The interior support or star separator, hereinafter, in the detailed description, both referred to as the "star separator", has a central region (12) extending along the longitudinal length of the star separator. The star separator has four prongs or splines. Each prong or spline (14), hereinafter in the detailed description both referred to as splines, extends outward from the central region and extends along the longitudinal length of the central region. The splines are integral with the central region. Each spline has a base portion (15). Each base portion is integral with the central region. Each spline has a base portion which has a horizontal width greater than the horizontal width of a portion of said spline above said base.

Each spline also has a first lateral side (16) and a second lateral side (17). The first and second lateral sides of each spline extend outward from the central region and converge towards each other to form a top portion (18). Each spline has a triangular cross section with preferably an isosceles triangle cross section. Each spline is adjacent with at least two other splines. For instance, spline (14) is adjacent to both adjacent spline (20) and adjacent spline (21).

The first lateral side of each spline is adjacent with a first or a second lateral side of another adjacent spline. The second lateral side of each spline is adjacent to the first or second side of still another adjacent spline.

Each pair of adjacent splines defines a groove (22). The angle (24) of each groove is greater than 90°. The adjacent sides are angled towards each other so that they join to form a crevice (26). The groove extends along the longitudinal length of the star separator. The splines are arranged around the central region so that a substantial congruency exists along a straight line (27) drawn through the center of the horizontal cross section of the star separator. Further, the splines are spaced so that each pair of adjacent splines has a distance (28), measured from the center of the top of one spline to the center of the top of an adjacent spline (top to top distance) as shown in FIG. 3. The top to top distance (28) being substantially the same for each pair of adjacent splines.

In addition, the shown embodiment has a preferred "tip to crevice" ratio of between about 2.1 and 2.7. Referring to FIG. 3, the "tip distance" (30) is the distance between two top portions opposite each other. The "crevice distance" (32) is

5

the distance between two crevices opposite each other. The ratio is measured by dividing the "tip" distance by the "crevice" distance.

The specific "tip distance," "crevice distance" and "top to top" distances can be varied to fit the requirements of the user such as various AWG's and impedances. The specific material for the star separator also depends on the needs of the user such as crush resistance, breaking strengths, the need to use gel fillings, the need for safety, and the need for flame and smoke resistance. One may select a suitable copolymer. The star separator is solid beneath its surface.

A strength member may be added to the cable. The strength member (33) in the shown embodiment is located in the central region of the star separator. The strength member runs the longitudinal length of the star separator. The strength member is a solid polyethylene or other suitable plastic, textile (nylon, aramid, etc.), fiberglass (FGE rod), or metallic material.

Conductors, such as the shown insulated twisted pairs, (34) are disposed in each groove. The pairs run the longitudinal length of the star separator. The twisted pairs are insulated with a suitable copolymer. The conductors are those normally used for data transmission. The twisted pairs may be Belden's DATATWIST 350 twisted pairs. Although the embodiment utilizes twisted pairs, one could utilize various types of insulated conductors with the star separator.

The star separator may be cabled with a helixed or S-Z configuration. In a helical shape, the splines extend helically along the length of the star separator as shown in FIG. 2. The helically twisted splines in turn define helically twisted conductor receiving grooves which accommodate the twisted pairs.

The cable (37) as shown in FIG. 2 is a high performance shielded 300 MHz data cable. The cable has an outer jacket (36), e.g., polyvinyl chloride.

Over the star separator is a polymer binder sheet (38). The binder is wrapped around the star separator to enclose the twisted pairs. The binder has an adhesive on the outer surface to hold a laterally wrapped shield (40). The shield (40) is a tape with a foil or metal surface facing towards the interior of the jacket. The shield in the shown embodiment is of foil and has an overbelt (shield is forced into round smooth shape)(41) which may be utilized for extremely well controlled electricals. A metal drain wire (42) is spirally wrapped around the shield. The drain spiral runs the length of the cable. The drain functions as a ground.

My use of the term "cable covering" refers to a means to insulate and protect my cable. The cable covering being exterior to said star member and insulated conductors disposed in said grooves. The outer jacket, shield, drain spiral and binder described in the shown embodiment provide an example of an acceptable cable covering. The cable covering, however, may simply include an outer jacket.

The cable may also include a gel filler to fill the void space (46) between the interior support, twisted pairs and a part of the cable covering.

An alternative embodiment of the cable utilizes an interior support having a first inner material (50) and a different second outer material (51) (see FIG. 5). The second material is a conforming shield which conforms to the shape defined by the outer surface of the first material (50). The conforming shield is a foil shield. The foil shield should have enough thickness to shield the conductors from each other. The shield should also have sufficient thickness to avoid rupture during conventional manufacture of the cable or during normal use of the cable. The thickness of the conforming shield utilized was about 3 mm. The thickness could go down to even 0.3

6

mm. Further, although the disclosed embodiment utilizes a foil shield as the conforming shield, the conforming shield could alternatively be a conductive coating applied to the outer surface of the first material (50).

To conform the foil shield (51) to the shape defined by the first material's (50) outer surface, the foil shield (51) and an already-shaped first material (50) are placed in a forming die. The forming die then conforms the shield to the shape defined by the first material's outer surface.

The conforming shield can be bonded to the first material. An acceptable method utilizes heat pressure bonding. One heat pressure bonding technique requires utilizing a foil shield with an adhesive vinyl back. The foil shield, after being conformed to the shape defined by the first material's outer surface, is exposed to heat and pressure. The exposure binds the conforming shield (51) to the outer surface of the first material (50).

A cable having an interior support as shown in FIG. 5 is the same as the embodiment disclosed in FIG. 1 except the alternative embodiment in FIG. 5 includes the second material, the conforming shield (51), between the conductors and the first material (50).

The splines of applicant's novel cable allow for precise support and placement of the twisted pairs. The star separator will accommodate twisted pairs of varying AWG's and impedance. The unique triangular shape of the splines provides a geometry which does not easily crush.

The crush resistance of applicant's star separator helps preserve the spacing of the twisted pairs, and control twisted pair geometry relative to other cable components. Further, adding a helical or S-Z twist improves flexibility while preserving geometry.

The use of an overall shield around the star separator allows a minimum ground plane surface over the twisted pairs, about 45° of covering. The improved ground plane provided by applicant's shield, allows applicant's cable to meet a very low transfer impedance specification. The overall shield may have a more focused design for ingress and egress of cable emissions and not have to focus on NEXT duties.

The strength member located in the central region of the star separator allows for the placement of stress loads away from the pairs.

It will, of course, be appreciated that the embodiment which has just been described has been given by way of illustration, and the invention is not limited to the precise embodiments described herein; various changes and modifications may be effected by one skilled in the art without departing from the scope or spirit of the invention as defined in the appended claims.

The invention claimed is:

1. An unshielded twisted pair data communications cable comprising:

a plurality of twisted pair conductors configured to carry data communications signals;

a non-conductive interior support consisting of at least one non-conductive material and having a surface that defines a plurality of channels in the data communications cable within which the plurality of twisted pair conductors are individually disposed; and

an outer jacket longitudinally enclosing the plurality of twisted pair conductors and the non-conductive interior support to form the data communications cable, the outer jacket being formed of a non-conductive material;

wherein the outer jacket in combination with the non-conductive interior support maintains the plurality of twisted pair conductors within the channels defined by the surface of the non-conductive interior support; and

US 7,977,575 B2

7

wherein the unshielded data cable does not include a shield between the outer jacket and the twisted pair conductors and the non-conductive interior support.

2. The unshielded twisted pair data communications cable as claimed in claim 1, wherein the non-conductive interior support comprises a longitudinally extending central portion and a plurality of projections extending radially outward from the longitudinally extending central portion to at least an outer boundary defined by an outer dimension of the twisted pair conductors.

3. The unshielded twisted pair data communications cable as claimed in claim 2, wherein the plurality of channels are defined by the plurality of projections.

4. The unshielded twisted pair data communications cable as claimed in claim 3, wherein each projection of the plurality of projections is adjacent two other projections of the plurality of projections, the plurality of projections forming a plurality of pairs of adjacent projections; and

wherein each channel of the plurality of channels is defined by one pair of adjacent projections of the plurality of adjacent projections.

5. The unshielded twisted pair data communications cable as claimed in claim 3, wherein the plurality of projections consists of four projections; and

the plurality of channels consists of four channels; and the plurality of twisted pair conductors consists of four twisted pair conductors.

6. The unshielded twisted pair data communications cable as claimed in claim 5, wherein each projection of the four projections extends radially outward from the central portion at approximately right angles to at least one other projection of the four projections.

7. The twisted pair data communications cable as claimed in claim 2, wherein the plurality of projections extend radially outward from the central portion to at least an outer boundary defined by an outer dimension of the twisted pair conductors.

8. The twisted pair data communications cable as claimed in claim 2, wherein each projection has a non-uniform width.

9. The twisted pair data communications cable as claimed in claim 8, wherein each projection has a substantially triangular shape.

10. The unshielded twisted pair data communications cable as claimed in claim 1, wherein the non-conductive interior support is formed of a copolymer.

11. The unshielded twisted pair data communications cable as claimed in claim 1, wherein each twisted pair conductor of the plurality of twisted pair conductors comprises two electrical conductors, each insulated with a copolymer, which are helically twisted together to form the twisted pair conductor.

12. The unshielded twisted pair data communications cable as claimed in claim 1, wherein the plurality of twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the cable.

13. The unshielded twisted pair data communications cable as claimed in claim 12, wherein the plurality of twisted pair conductors and the non-conductive interior support are twisted together with one of a helical twist and an S-Z twist.

14. The unshielded twisted pair data communications cable as claimed in claim 1, wherein the non-conductive interior support is a one-piece plastic interior support which is solid beneath the surface.

15. The twisted pair data communications cable as claimed in claim 1, wherein the unshielded data cable does not include any additional layers between the outer jacket and the twisted pair conductors and the non-conductive interior support.

16. The twisted pair data communications cable as claimed in claim 1, further comprising a gel filler filling a void space

8

between the non-conductive interior support, the plurality of twisted pair conductors, and the outer jacket.

17. A twisted pair data communications cable comprising:

four twisted pair conductors configured to carry data communications signals;

a non-conductive interior support having a surface that defines four channels, one twisted pair conductor of the four twisted pairs of conductors respectively disposed in each of four channels; and

an outer jacket longitudinally enclosing the four twisted pair conductors and the non-conductive interior support to form the data communications cable, the outer jacket consisting of one or more non-conductive materials;

wherein the outer jacket in combination with the non-conductive interior support maintains the four twisted pair conductors within the four channels defined by the surface of the non-conductive interior support;

wherein the non-conductive interior support comprises a longitudinally extending central portion and four projections extending radially outward from the central portion;

wherein the four channels are defined by adjacent pairs of the four projections; and

wherein each projection has a non-uniform width.

18. The twisted pair data communications cable as claimed in claim 17, wherein the non-conductive interior support is a one-piece plastic interior support formed of a copolymer.

19. The twisted pair data communications cable as claimed in claim 18, wherein the non-conductive interior support is solid beneath the surface.

20. The twisted pair data communications cable as claimed in claim 17, wherein the four twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the cable.

21. The twisted pair data communications cable as claimed in claim 20, wherein the four twisted pair conductors and the non-conductive interior support are twisted together with one of a helical twist and an S-Z twist.

22. The twisted pair data communications cable as claimed in claim 17, wherein the outer jacket comprises polyvinyl chloride.

23. The twisted pair data communications cable as claimed in claim 17, wherein each projection has a substantially triangular shape.

24. A twisted pair data communications cable consisting of:

four twisted pair conductors configured to carry data communications signals;

a non-conductive interior support comprising a longitudinally extending central portion and four projections extending radially outward from the central portion; and

an outer jacket longitudinally enclosing the four twisted pair conductors and the non-conductive interior support, the outer jacket being formed of a non-conductive material;

wherein the four projections form four adjacent pairs of projections that define four channels in which the four twisted pair conductors are individually disposed;

wherein each projection of the four projections has a base that is integral with the central portion of the non-conductive interior support, a tip, a first lateral side, and a second lateral side, the first lateral side and the second lateral side extending from the base to the tip of the projection, the first and second lateral sides converging toward one another from the base to the tip of the projection;

A49

US 7,977,575 B2

9

wherein the outer jacket in combination with the non-conductive interior support maintains the four twisted pair conductors within the four channels defined by the four adjacent pairs of projections; and

wherein the four twisted pair conductors and the non-conductive interior support are twisted together about a common axis to close the data communications cable.

25. The twisted pair data communications cable as claimed in claim **24**, wherein the non-conductive interior support comprises a one piece interior support that is formed of a copolymer and unshielded.

26. The twisted pair data communications cable as claimed in claim **24**, wherein the outer jacket contacts the tip of each projection.

27. The twisted pair data communications cable as claimed in claim **24**, wherein the outer jacket comprises polyvinyl chloride.

28. The twisted pair data communications cable as claimed in claim **24**, wherein the cross-sectional shape of each projection of the plurality of projections is approximately an isosceles triangle.

29. An unshielded twisted pair data communications cable comprising:

a plurality of twisted pair conductors configured to carry data communications signals;

a non-conductive, unshielded interior support constructed and arranged within the cable to provide at least two channels within which the plurality of twisted pair con-

10

ductors are disposed, at least one channel containing at least two twisted pair conductors; and

an outer jacket longitudinally enclosing the plurality of twisted pair conductors and the non-conductive interior support;

wherein the non-conductive, unshielded interior support consists of at least one dielectric material; and

wherein the plurality of twisted pair conductors and the non-conductive interior support are helically twisted together about a common central axis to close the data communications cable.

30. The unshielded twisted pair data communications cable as claimed in claim **29**, wherein the non-conductive interior support comprises a copolymer.

31. The unshielded twisted pair data communications cable as claimed in claim **29**, wherein the cable does not include a shield or any additional layers between the outer jacket and the twisted pair conductors and the non-conductive interior support.

32. The unshielded twisted pair data communications cable as claimed in claim **29**, wherein the outer jacket comprises polyvinyl chloride.

33. The unshielded twisted pair data communications cable as claimed in claim **29**, wherein the non-conductive interior support is solid beneath its surface.

34. The unshielded twisted pair data communications cable as claimed in claim **29**, further comprising a non-conductive binder disposed beneath the outer jacket.

*     *     *     *     *

# United States Court of Appeals
## for the Federal Circuit
*Belden Inc. v. Berk-Tek LLC,* 14-1676

## <u>CERTIFICATE OF SERVICE</u>

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by FOLEY & LARDNER LLP, Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **October 3, 2014,** counsel has authorized me to electronically file the foregoing **Brief for Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

James S. Blank
*(Principal Counsel)*
David Soofian
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
212-836-7528
james.blank@kayescholer.com
David.Soofian@kayescholer.com
*Counsel for Appellee*

Gregory Charles Antrim
Joseph Sofer
Sofer & Haroun, L.L.P.
317 Madison Avenue, Suite 910
New York, NY 10017
212-697-2800
gregantrim@soferharoun.com
joesofer@soferharoun.com
*Counsel for Appellee*

Paper copies will also be mailed to the above principal counsel when paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

October 3, 2014

/s/ John C. Kruesi, Jr.
Counsel Press

## <u>CERTIFICATE OF COMPLIANCE</u>

Appellant Belden's brief is submitted in accordance with Federal Rule of Appellate Procedure 32(a)(7)(B)(i). As to the items identified in Federal Rule of Appellate Procedure 32(a)(b)(B)(iii), the brief contains 12,300 words, as determined by Microsoft Word.

This brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated: October 3, 2014                    Respectfully submitted,

/s/ Matthew A. Ambros
Matthew B. Lowrie
Aaron W. Moore
Matthew A. Ambros
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
P: (617) 342-4000
F: (617) 342-4001

*Attorneys for Appellant Belden Inc.*